UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 16-0189 JGB (SPx)** | Date | March 10, 2017 |
| Title | *Veda Woodard et al. v. Lee Labrada et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   Order: (1)  GRANTING IN PART and DENYING IN PART Harpo Productions, Inc., Dr. Mehmet C. Oz, Zoco Productions, and Sony Pictures Television, Inc.'s Motion to Dismiss (Dkt. No. 94); (2) DENYING Entertainment Media Venture's Motion to Dismiss (Dkt. No. 98-1); and (3)  DISMISSING Plaintiffs' Claims Against Sony Pictures Television, Inc. WITHOUT LEAVE TO AMEND (IN CHAMBERS)

Before the Court are: (1) a Motion to Dismiss filed by Harpo Productions, Inc. ("Harpo"), Dr. Mehmet C. Oz ("Dr. Oz"), ZoCo Productions, LLC. ("ZoCo"), and Sony Pictures Television, Inc. ("Sony") (collectively, the "Media Defendants") ("MTD 1," Dkt. No. 94); and (2) a Motion to Dismiss by Entertainment Media Ventures, Inc. ("EMV"). ("MTD 2," Dkt. No. 98-1.)  The Court finds both motions appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering all papers timely filed in support of and in opposition to the motions, the Court: (1) GRANTS IN PART and DENIES IN PART the Media Defendants' Motion to Dismiss; and (2) DENIES EMV's Motion to Dismiss.

## I. BACKGROUND

**A. Procedural History**

On February 2, 2016, plaintiff Vera Woodard ("Woodard"), a California resident, filed a putative class action complaint against Lee Labrada, Labrada Bodybuilding Nutrition, Inc., Labrada Nutritional Systems, Inc., ("Labrada Defendants"), Naturex, Inc., InterHealth Nutraceuticals Inc., (the "Supplier Defendants"), and the Media Defendants (collectively, "Defendants"). (Dkt. No. 1.)  In her initial complaint, Woodard asserted eight claims arising from Defendants' alleged misrepresentations surrounding the effectiveness of weight loss supplements manufactured by the Labrada Defendants that contain active ingredients produced

by the Supplier Defendants. (Dkt. No. 1.) The complaint alleged claims for fraudulent misrepresentation and deceptive advertising in connection with the labeling, promotion, and sale of the supplements and the proprietary active ingredients therein. (Id.)

On April 4, 2016, the Media Defendants filed a motion to dismiss, (Dkt. No. 45), which Woodard opposed on April 18, 2016. (Dkt. No. 61.) On April 25, 2016, the Media Defendants filed a reply memorandum and a response to Woodard's evidentiary objections. (Dkt. No. 72, 72-1.) On April 11, 2016, the Media Defendants filed a motion to strike, (Dkt. No. 49), which was opposed by Woodard on April 19, 2016. (Dkt. No. 62.) The Media Defendants replied on April 25, 2016. (Dkt. No. 73.)

On May 12, 2016, the Court granted in part and denied in part Media Defendants' motion to dismiss. (Dkt. No. 85.) The May 12, 2016 Order, ("The Order"), dismissed Plaintiff's Consumer Legal Remedies Act and breach of warranty claims against the Media Defendants. (Id.) The Order also dismissed claims against ZoCo premised on the existence of a joint venture or civil conspiracy. (Id.) Woodard was granted leave to amend her complaint, and the Court deferred consideration of the Media Defendants' motion to strike until the close of discovery. (Id.)

A First Amended Complaint ("FAC") was filed on June 2, 2016, adding two more plaintiffs—New York residents Teresa Rizzo-Marino and Diane Morrison—and joining EMV as a defendant. (Dkt. No. 88.) The FAC also adds statutory claims for unfair business practices, false advertising, and breach of warranty under New York law. (N.Y. Gen. Bus. Law §§ 349, 350; N.Y. U.C.C. §§ 2-313, 2-314) (Id. at 74-75.)

On June 24, 2016, the Media Defendants filed a Motion to Dismiss. (MTD 1.) EMV filed its Motion to Dismiss on July 15, 2016. (MTD 2.) On July 21, 2016, Plaintiffs filed their Opposition to the Media Defendants' Motion. ("Opposition 1," Dkt. No. 104.) The Media Defendants filed a reply memorandum on August 5, 2016. ("Reply 1," Dkt. No. 108.) Plaintiffs opposed EMV's motion to dismiss on September 2, 2016, to which EMV replied on September 23, 2016. ("Opposition 2," Dkt. No. 115; "Reply 2," Dkt. No. 117.)

**B. Factual Allegations and Claims**

The FAC asserts claims arising from Defendants' representations regarding the quality, effectiveness, and sponsorship of weight-loss supplements manufactured by the Labrada Defendants. The FAC contains the following allegations, which are taken as true for purposes of these motions. Plaintiffs Veda Woodard, Teresa Rizzo-Marino, Diane Morrison (collectively, "Plaintiffs"), and putative class members all purchased Labrada brand weight-loss products. (Id. at 13-14.) Specifically, Plaintiffs bought either or both of the Labrada Garcinia Cambogia DUAL ACTION FAT BUSTER and Labrada Green Coffee Bean Extract FAT LOSS OPTIMIZER (the "Products" or "supplements") on multiple occasions. (Id.) The supplements can be purchased online or at vitamin shops across the country. (Id. at 12.)

Naturex manufactures and holds the trademark for Svetol, which is the active ingredient in the Labrada Green Coffee Bean Extract FAT LOSS OPTIMIZER. (Id. at 6.) InterHealth manufactures and holds the trademark for SuperCitrimax, which is the active ingredient in the Labrada Garcinia Cambogia DUAL ACTION FAT BUSTER. (Id.) Plaintiffs allege that Naturex advertises Svetol as the "most studied and proven green bean extract," and attributes its effectiveness to "100% premium Robusta beans" processed to yield a "high concentration of key chlorogenic acids." (See id.) InterHealth allegedly markets SuperCitrimax through a powerful "co-branding strategy" and Plaintiffs claim it shores up its "maximum stability, solubility, bioavailability, and efficacy" by characterizing its product as "60% all natural HCA derived from the Garcinia Cambogia fruit." (Id.) The Labrada Defendants allegedly advertise the Products as "clinically proven" "FAT BUSTERS" with "ZERO BINDERS, ZERO FILLERS, AND ZERO ARTIFICIAL INGREDIENTS." (Id. at 7.)

The FAC alleges that representations on the Products' labels are false or misleading. Specifically, Plaintiffs claim that "ZERO FILLERS, ZERO BINDERS, ZERO ARTIFICIAL INGREDIENTS" is deceptive because the supplements contain artificial ingredients. (Id. at 30.) For example, Plaintiffs allege that SuperCitrimax is a synthetic form of hydroxycitric acid (HCA). (Opp. 3 at 15.) Plaintiffs further claim that Defendants misrepresented the quantity of active ingredients in the Labrada Products, the origin of the ingredients ("Made in the USA"), and the overall quality of the Products. (FAC at 30-32, 24, 28, 63, 65, 73.) For example, the Labrada Defendants cite "peer reviewed, published" scientific studies on the labels to claim that the Products "support significant weight loss." (Id.) But Plaintiffs maintain that one such study, specifically, the Vinson Study, was later "retracted by the authors after data was found to be falsified." (Id. at 43.)

The FAC also charges Dr. Oz with fraudulently promoting the Labrada Products on his show by misrepresenting his affiliations with the brands he allegedly endorses. (Id. at 19.) Plaintiffs support their claims variously by, among other things, pointing to Dr. Oz's statements, his espousal of studies performed by Supplier Defendants' paid researchers, and representations displayed on his website. (Id. at 38-46.) For instance, Dr. Oz allegedly referred to the Vinson Study when touting the magic of the Green Coffee Extract as a weight-loss aid to his viewers. (Id.) He also described it as a "good quality" study during the Senate Hearing on "Protecting Consumers from False and Deceptive Advertising of Weight-Loss Supplement Products." (Id. at 1-2, 9.)

After watching Dr. Oz's shows in 2012, during which Dr. Oz pronounced the weight-loss benefits of Green Coffee Bean Extract and Garcinia Cambogia,[1] Plaintiffs purchased the Products on multiple occasions spanning 2013 and 2014. (Id. at 12-13.) Plaintiffs maintain that the labels contained the same representations made by Dr. Oz regarding the quality and effectiveness of the ingredients and the concentration of the extracts so they were undeterred by

---

[1] (See, e.g., id. at 40-41) (describing the Green Coffee as the "revolutionary" "newest, fastest fat buster.")

their true nature.[2] Even if Plaintiffs were not yet convinced that the Products were all-natural, fully-American antidotes to hunger and obesity, their labels allegedly cited the studies that Dr. Oz either referred to on his show or were performed by his guests. (Id.)

The FAC alleges that Dr. Oz had undisclosed paid spokespersons for InterHealth and Naturex on his show to promote the Products. (Id.) What's more, Plaintiffs allege that Dr. Oz told his viewers these guests were doctors or scientists when they had no such credentials. (Id.) For instance, the producers of The Dr. Oz Show allegedly invited Lindsey Duncan, a spokesperson for Svetol, on the show to promote Naturex's product. (Id.) Since he was not a real doctor, Duncan was allegedly provided a script that he edited to publicize the precise key words to use to find the products he was pushing online. (Id.) Plaintiffs describe how Duncan was able to ride the coattails of the "Oz effect," just like the Defendants in this action, by dressing his unsubstantiated claims in the pretense of medical truth to exploit the palpable advantage the power of medicine has in the marketplace—an advantage that resides in the naiveté of the average consumer and the trust consumers place on their doctor's advice. (Id. at 9, 46.)

According to Plaintiffs, this trust is why consumers believe Dr. Oz when he denies he endorses any specific brands or products. (Opp. 3 at 3); (FAC at 4.) But Plaintiffs allege that these undisclosed product placements constitute illegal "payola" in violation of the Federal Communications Commission's ("FCC") payola disclosure requirements. (Id.) And "as a renown [sic] surgeon at Columbia University Medical School," Plaintiffs maintain Dr. Oz knew or "should have known that the supplement products he promoted were ineffective at providing weight-loss benefits." (Id.) Plaintiffs further contend that Dr. Oz knew or should have known that the studies did not meet any of the standards for scientific research to be accepted in the medical community. (Id. at 42.) Dr. Oz is allegedly able to enter into these surreptitious endorsement deals through strategic partnerships that are generated through the joint efforts of the Media Defendants. (Id. at 19.) The Media Defendants are alleged to aid Dr. Oz by concealing these arrangements and ill-gotten gains through various shell entities. (Id.)

On those bases, Plaintiffs allege Defendants entered a joint venture to employ "deceptively formatted advertisements" to exploit information asymmetries between consumers and the "doctors" and "researchers" they pay to promote their products. (Id. at 10.) Plaintiffs allege that Defendants harness the trust that viewers vest in "America's Doctor" to capitalize on Dr. Oz's experience and credentials, while Dr. Oz can further monetize his M.D. by representing that his recommendations are the product of unbiased professional judgment. (Id. at 11.) The FAC therefore alleges that Dr. Oz, ZoCo, Harpo, and Sony are jointly liable for Dr. Oz's misrepresentations because they have formed a joint venture and/or are engaged in a civil conspiracy to profit from fraudulently promoting the Products on the show. (Id.) The FAC

---

[2] (See, e.g., FAC at 40) ("I've warned everybody that I'm not going to mention specific brands, but I do want to go through exactly what I would look for. You're going to look on that list of ingredients. There should be ZERO FILLERS. There should be ZERO BINDER, ZERO ARTIFICIAL INGREDIENTS. . .")

alternatively alleges that Defendants aided and abetted one another, acted as each other's agents, and substantially assisted in fraud that is the alleged objective of their scheme. (Id.)

Accordingly, Plaintiffs bring the following six claims against the Media Defendants and EMV: (1) fraud, deceit and suppression of facts, (2) negligent misrepresentation, (3) unfair competition under California Business and Professions Code section 17200, et seq., ("UCL") (4) false advertising under California Business and Professions Code section 17500, et seq., ("FAL") (5) unfair trade practices under New York Business Law section 349, and (6) false advertising under New York Business Law section 350. (Id. at 54, 66, 67, 73, 81, 82.)

## II. DISCUSSION

In their respective motions, the Media Defendants and EMV assert that Plaintiffs fail to sufficiently allege all of their claims under Rule 12(b)(6).[3] With respect to Plaintiffs' fraud claims, the Media Defendants and EMV argue that they are both time-barred, and fail under Rule 9(b) because they are not pled with particularity. (See,e.g., MTD 2 at 7, 8.) Since the lapsing of the statutes of limitations is a threshold requirement, the Court first discusses whether Plaintiffs' claims are timely, and then turns to the sufficiency of allegations under Rules 12(b)(6) and Rule 9(b).

### A. Timeliness

EMV and the Media Defendants assert that the relevant statutes of limitations have lapsed for Plaintiffs' fraud, negligent misrepresentation, unfair competition, unfair business practices, and false advertising claims.[4] (MTD 1 & MTD 2 at 3.) Defendants maintain that the running of

---

[3] "Rule" refers to the Federal Rules of Civil Procedure unless otherwise indicated.

[4] "An action for relief on the ground of fraud or mistake" has a three-year statute of limitations. Cal. Code Civ. Proc. § 338(d). The cause of action does not accrue until the aggrieved party has the opportunity to discover the facts constituting fraud or mistake. Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F. 3d 1049, 1054 (9th Cir. 2009). Negligent misrepresentation claims have a two-year statute of limitations. Cal. Civ. Proc. Code § 339(1). California's Unfair Competition Law requires that lawsuits be brought within four years after the cause of action accrued. Cal. Bus. & Prof. Code § 17208. There is no express statute of limitations for claims brought under California's False Advertising Law. Cal. Bus. & Prof. Code §§ 17500-17577.5. Common law fraud claims in New York have a six-year statute of limitations, N.Y. C. P. L. R. §213(8), while violations of New York's consumer protection statutes, New York General Business Law sections 349 and 350, have a three-year statute of limitations. M & T Mortgage Corp. v. White, 736 F. Supp. 2d 538 (E.D.N.Y. 2010) ("Statute of limitations for deceptive practices claim under New York's General Business Law is ordinarily three years, which begins to run when injury occurs.") (citing N.Y. Gen. Bus. Law §§ 349; 350; N.Y. C.P.L.R. 214-c). California Commercial Code § 2725 provides for a four-year statute of

the statute of limitations is apparent from the face of the FAC because: (a) there is no ambiguity as to when the tortious statements were made by Dr. Oz, and (b) since the Uniform Single Publication Act ("USPA") applies to mass publications, Plaintiffs cannot rely on the discovery rule to toll the statutes of limitations. (Id. at 12, 2.)

"A claim may be dismissed as untimely pursuant to a 12(b)(6) motion 'only when the running of the statute [of limitations] is apparent on the face of the complaint.'" U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc., 720 F.3d 1174, 1178 (9th Cir. 2013) (citations omitted). The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." WA Southwest2, LLC v. First American Title Insurance Company, 240 Cal. App. 4th 148, 156 (2015). To invoke the discovery rule, a plaintiff must plead: "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." Id. at 157. (emphasis in original); Nguyen v. W. Digital Corp., 229 Cal. App. 4th 1522, 1553 (2014).

Defendants' arguments as to the timeliness of Plaintiffs' claims are interdependent. To assert the statute of limitations as an affirmative defense, there must be no ambiguity as to when the statute of limitations period commenced. For there to be no ambiguity as to the running of the statute of limitations, the discovery rule cannot apply to Plaintiffs' claims. And for the discovery rule to unambiguously bar Plaintiffs' claims, such claims must be covered by the USPA.

The Uniform Single Publication Act states:

> No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture.

Cal. Civ. Code § 3425.3. For the USPA to apply, all of the elements for the cause of action must exist at the time the allegedly tortious statement is initially published. Aryeh v. Canon Business Solutions, Inc., 55 Cal. 4th 1185, 1195 (2013). This threshold requirement ensures that fairness concerns for an unsuspecting plaintiff are untethered from the facts underlying the specific cause of action plaintiff asserts. This principle can be illustrated by the differing approaches taken by California courts for fraud claims versus the approach taken for claims where allegations of deceit are absent.

In Aryeh v. Canon Business Solutions, Inc., 55 Cal. 4th 1185, 1195 (2013), the California Supreme Court explained how courts should determine the USPA's reach when a statute is silent on accrual. The court held that the discovery rule could be invoked to toll accrual of UCL claims because "just like common law claims challenging fraudulent conduct, a UCL deceptive

---

limitations on breaches of contract and warranty in connection with the sale of goods. Cal. Uniform Comm. Code § 2313.

practices claim should accrue 'only when a reasonable person would have discovered the factual basis for a claim.'" Id. at 1195; see Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd., 909 F. Supp. 1353 (C.D. Cal. 1995), aff'd, 113 F.3d 1258 (Fed. Cir. 1997).

Defendants cite Alberghetti v. Corbis Corp., 713 F. Supp. 2d 971 (C.D. Cal. 2010) to ostensibly argue that the USPA categorically eliminates the discovery rule for any torts committed over mass media. (MTD 1 at 6.)  But Alberghetti involved a claim against a photo-licensing company for statutory and common law violations of the right of publicity, which accrues at the moment the allegedly infringing writing or image is initially published.  Id. Like the other cases Defendants cite, Alberghetti rejected reliance on the discovery rule to revive otherwise stale claims because the plaintiff *could have brought the claim at the time of the initial publication.*  Panatela v. Van De Camp, 486 F. 3d 1128  (9th Cir. 2007) (concluding that once the State Bar had posted the attorney's disciplinary record on the internet,  the "'knows or has reason to know standard' was met," allowing for the single publication to give rise to a single cause of action).[5]

Here, on the other hand, Plaintiffs' fraud claims would not have necessarily accrued at the time Dr. Oz initially made the allegedly offending statements on his show in 2012.  In fact, Plaintiffs presumably could not have brought their claims until after they purchased the Products (either in 2013 or 2014), and became aware that the statements Dr. Oz made on his show were false.  If the single publication rule were to apply at all to Plaintiffs' claims, it would only apply to the public statements made by Dr. Oz during the Senate Hearing because this "publication" would ostensibly be the first time Plaintiffs could reasonably suspect that they were deceived into purchasing the Products.

Defendants also cite Shively v. Bozanich, 31 Cal. 4th 1230 (2003), to argue that the USPA must be interpreted broadly.[6]  But Defendants seem to ignore that the purpose of statutes of limitations, to protect the defendant's interest in repose, is vitiated when that defendant is alleged to have engaged in fraudulent concealment. While Shively stands for the proposition that the single publication rule is not limited to defamation actions, its applicability still presupposes that the cause of action is of the type that could arise at the moment the publication occurs. Id. Indeed, the statutory text of the USPA qualifies "any other tort" with "founded upon any single publication or exhibition or utterance." Cal. Civ. Code § 3425.3.  This qualifier evinces the Legislature's intent to eliminate an entire body of common law articulating equitable tolling principles only when delay in bringing suit would legitimately chill speech. [7]  Even the court in

---

[6] The Court in Shively, 31 Cal. 4th 1230, applied the USPA to a defamation claim arising from statements published in a book. Shively held the discovery rule inapplicable because the plaintiff failed to plausibly allege the defendant engaged in fraudulent concealment. (2003).

[7] The Uniform Single Publication Act was passed "to address the problem that arose with the advent of mass communication from the general rule in defamation cases that each time the defamatory statement is communicated to a third person ... the statement is said to have been 'published,' giving rise to a separate cause of action." Christoff v. Nestle USA, Inc., 47 Cal. 4th

Shively noted that "[i]n some tort actions, the accrual of the cause of action is delayed until the plaintiff knew, or with reasonable diligence should have known, of the factual basis for the claim." Shively, 31 Cal. 4th at 1230. Indeed, for claims grounded in fraud equitable principles favor tolling the statute of limitations when a defendant's wrongful conduct delays the time at which the plaintiff may suspect she has been wronged. Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).

Defendants also rely on Long v. Walt Disney, 116 Cal. App. 4th 868 (2004) to argue that Plaintiffs' claims are time-barred. (See, e.g., Reply 2 at 9.) The court in Long found that the doctrine of fraudulent concealment did not apply to toll the statute of limitations because the plaintiffs in that case failed to allege either affirmative deceptive conduct or a fiduciary relationship. Long, 116 Cal. App. 4th at 875. Yet, the court made clear that where plaintiffs allege that defendants engaged in a pattern of fraudulent conduct that has delayed the time at which plaintiffs may discover their injury, equitable principles allow for the statute of limitations to be tolled. Id.; see Huynh v. Chase Manhattan Bank, 465 F.3d 992 (9th Cir. 2006).

Plaintiffs allege ongoing affirmative deceptive conduct that occurred as late as 2014. Since "[a]llegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period," it is not clear from the face of the FAC that the statute of limitations has indeed run. Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185, 1198 (2013).

The applicability of equitable tolling doctrines to Plaintiffs' claims, therefore, depends on matters outside the pleadings, which cautions against granting Defendants' motions to dismiss on this basis. See Huynh v. Chase Manhattan Bank, 465 F.3d 992 (9th Cir. 2006) ("[I]t is rarely appropriate to grant a motion to dismiss for failure to state a claim if equitable tolling is at issue."). Since it is plausible that Plaintiffs did not have constructive notice of Defendants' alleged deception until 2014, it is not apparent from the face of the FAC that Plaintiffs' claims are time-barred. Plaintiffs' claims must be analyzed separately in conjunction with facts outside the pleadings to determine if equitable tolling principles apply. [8] Accordingly, the Court DENIES Defendants' motions to dismiss on this basis.

---

468, 477, 213 P.3d 132, 137–38 (Cal. 2009) (internal citations omitted)(internal quotation marks omitted).

[8] For instance, the continuing violation rule may apply, which would allow for continuing accrual when misfeasance is ongoing. Furthermore, the continuing violations doctrine may toll the statute of limitations for Plaintiffs' claims premised on the existence of a conspiracy. The Court would have to consider facts outside the pleadings to determine if the statute of limitations has lapsed because "[w]hen a civil conspiracy is properly alleged and proved, statute of limitations does not begin to run on any part of a plaintiff's claim until 'last overt act' pursuant to conspiracy has been completed." Wyatt v. Union Mortgage Co., 24 Cal. 3d 773 (1979).

### B. Rule 12(b)(6) and Rule 9(b)

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

Surviving a motion to dismiss requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Rule 9(b) presents heightened pleading requirements for plaintiffs alleging fraud or mistake. In alleging fraud or mistake, the plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Failure to satisfy this heightened pleading requirement can result in dismissal of the claim. Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003). In general, the plaintiff's allegations of fraud or mistake must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Id. at 1106; Swartz v. KPMG LLP, 476 F.3d 756 (9th Cir. 2007)("In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme to satisfy the fraud pleading rule."). This heightened pleading standard requires the plaintiff to allege fraud or mistake by detailing "the who, what, when, where, and how" of the misconduct

charged. Id. at 1106-07. In other words, the plaintiff must specify the time, place, and content of the alleged fraudulent or mistaken misconduct. See id.

Although the scope of review on a Rule 12(b)(6) motion to dismiss is limited to the contents of the complaint, the Court may consider certain materials, such as documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. United States v. Ritchie, 342 F.3d 903, 907-08 (9th Cir. 2003). Under the incorporation by reference doctrine, the Court may consider documents not attached to the pleading if: (1) those documents are referenced extensively in the complaint or form the basis of the plaintiff's claim; and (2) if no party questions their authenticity. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

### C. Sufficiency of Allegations

The Media Defendants and EMV put forth similar arguments in support of their motions to dismiss under Rule 12(b)(6) and Rule 9(b). Defendants also raise various arguments as to why the consumer protection statutes do not apply to their conduct as alleged. The sufficiency of Plaintiffs' allegations vary with each claim and each theory of liability they advance. Since any failure to state a claim under a theory of direct liability still permits a finding that the allegations are sufficient to state some of Plaintiffs' claims under theories of secondary liability, the Court first discusses the forms of secondary liability available to Plaintiffs under California and New York law.

#### 1. Secondary Liability

All persons concerned in the commission of a tort may be joined as defendants, or may be sued separately. Rogers v. Ponet, 21 Cal. App. 577 (1913). California courts have recognized six forms of secondary liability: aiding and abetting or "furnishing the means," agency or respondeat superior, alter ego or joint enterprise, and conspiracy. The Court discusses each form of secondary liability in turn.

Liability may be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. Saunders v. Superior Court, 27 Cal. App. 4th 832, 846 (1994); Sheehy v. New Century Mortgage Corp., 690 F. Supp. 2d 51 (E.D.N.Y. 2010). "[I]naction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." Sheehy, 690 F. Supp. 2d at 51.

An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410-11 (2007). Once an agency relationship is established, the principal can be held liable for the acts of its agent. Von Beltz v. Stuntman, Inc., 207 Cal. App. 3d

1467, 1488 (1989); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936 (N.D. Cal. 2014)(explaining that under New York law, an agent may bind his principal in matters within the scope of his agency, "and the principal is liable for an agent's misrepresentations or other frauds that cause pecuniary loss to a third party.").

A joint venture is "an undertaking by two or more persons jointly to carry out a single business enterprise for profit, and requires a community of interest." Goldberg v. Paramount Oil Co., 143 Cal. App. 2d 215 (1956). The doctrine of joint enterprise or alter ego liability is applied when one corporation uses another to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose; in these situations, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. Gopal v. Kaiser Found. Health Plan, Inc., 248 Cal. App. 4th 425 (2016).  To determine whether a joint enterprise exists, courts look to see if the parties have "equal rights to direct and govern the conduct of each other with respect thereto, " "[a] joint proprietary interest and right of mutual control over the subject matter of the enterprise," and "a close and even" fiduciary relationship. Id.   The intent of the parties is the most decisive factors courts look to in determining whether a joint venture exists. Preach v. Monter Rainbow, 12 Cal. App. 4th 1441 (1993).  Where evidence is in dispute, existence or nonexistence of a joint venture is a question of fact to be decided at trial. Id.

Civil conspiracy is not a separate cause of action; it merely "imposes liability on persons whom, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its preparation." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11 (1994).  And "[p]ersonal liability, if otherwise justified, may rest upon a conspiracy among officers and directors to injure third parties through corporation." Wyatt, 24 Cal. 3d 773.  To establish a civil conspiracy, Plaintiffs must show: (a) an agreement among the alleged conspirators to commit a tortious act (formation and operation of the conspiracy); (b) the tortious act(s) committed pursuant to the agreement; and (c) resulting damage to the Plaintiffs. Wyatt v. Union Mortgage Co., 24 Cal. 3d 773 (1979).  Courts apply Rule 9(b)'s heightened pleading standard to claims of civil conspiracy where the object of the conspiracy is to commit fraud.  See Wasco Prods., Inc., v. Southwall Techs., Inc., 435 F.3d 989, 990-91 (9th Cir. 2006).  Yet, "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007); Id.

**2. Analysis**

EMV argues Plaintiffs' fraud claim is insufficiently pled under Rule 12(b)(6) and Rule 9(b) because "[t]he FAC states no facts showing any wrongdoing." (MTD 2 at 10.)  In so doing, EMV maintains that Plaintiffs' allegations based on information and belief are deficient because of the heightened pleading burden that applies to fraud claims against corporate employers. (Id. at 5.) Citing Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989), EMV maintains that to state a fraud claim against a corporate employer, like itself, "Plaintiffs must allege the names of the persons who made the representations, their authority to speak, to whom

they spoke, what they stated, and when." (MTD 2 at 9.) EMV therefore argues that the FAC falls short of alleging that any one of the Media Defendants had the requisite fraudulent intent and therefore do not "rise above speculation and conjecture." (Id.) As to Plaintiffs' statutory claims, EMV argues that Plaintiffs do not allege that EMV made any specific representations, not to mention any materially false statements that caused injury. (MTD 2 at 31.) EMV further argues that it cannot be secondarily liable for the torts of others because Plaintiffs fail to adduce sufficient facts to show that EMV: (a) engaged in a joint enterprise; (b) participated in a civil conspiracy; (c) was in an agency relationship with any one of its co-defendants; or (d) aided and abetted Dr. Oz or the other Defendants in tortious activity.

The Media Defendants argue that Plaintiffs fail to state a claim under any of the theories of secondary liability they advance because the FAC does not contain sufficient particularized allegations to satisfy Rule 9(b). (MTD 1.) The Media Defendants maintain that the "FAC does not plausibly allege that ZoCo, Harpo or Sony participated in a joint venture or civil conspiracy with Dr. Oz or were in any way involved in furthering Dr. Oz's alleged misconduct." (Reply 1 at 9.) For instance,, the Media Defendants maintain that the FAC fails to allege what "substantial assistance" ZoCo provided to Dr. Oz. (MTD 1 at 10.) In addition, the Media Defendants dispute the adequacy of allegations to infer an agency relationship between ZoCo and Dr. Oz because it is pure speculation, in their view, to infer a principal-agent relationship from Dr. Oz's @ ZoCo email address. (Id.) As to Sony, the Media Defendants argue that the Distribution Agreement Plaintiffs attached as Exhibit C does not plausibly allege the existence of a joint venture because "it does not purport to be anything more than a prediction of what 'will be' happening sometime in the future." (Id. at 11.)

Elements of cause of action for fraud in California and New York are: (1) misrepresentation, (for example, false representation, concealment, or nondisclosure**),** (2) knowledge of falsity, or scienter, (3) intent to defraud, (that is, to induce reliance), (4) justifiable reliance, and (5) resulting damage. Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861 (N.D. Cal. 2012); accord Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998).

A failure to disclose a fact can constitute actionable fraud or deceit when: (1) the defendant is the plaintiff's fiduciary; (2) the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations that are misleading because some other material fact has not been disclosed. Collins v. eMachines, Inc., 202 Cal. App. 4th 249 (2011); Martian Entm't, LLC v. Harris, 824 N.Y.S.2d 769 (2006) ("A failure to disclose or omission, the plaintiff must allege a confidential or fiduciary relationship giving rise to a duty to speak.").

To allege a claim for negligent misrepresentation, a plaintiff must plead: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc., 196 Cal. App. 4th 1559, 1573 ( Cal. Ct. App. 2011) (citation and internal quotation marks omitted).  Also, under California and New York law, "[t]he existence of a duty

of care is necessary to support a negligent misrepresentation claim." Jackson v. Fischer, 931 F.Supp.2d 1049, 1068 (N.D.Cal.2013) (citations omitted); Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998).

### a. EMV

Plaintiffs adequately allege their fraud claim against EMV. As to EMV's direct participation, Plaintiffs allege that EMV is responsible for facilitating strategic partnerships between Dr. Oz, like endorsements, collaborations, speaking engagements, and equity deals, etc. (FAC at 19.) The content excerpted from EMV's website— "Our goal is for Dr. Oz to forge a direct and authentic connection between you and your demographic," to create an "alliance" that "will ensure brand integrity, large scale awareness, and continued financial growth"—allows the Court to plausibly infer that EMV played a direct role in causing Dr. Oz's affirmative misrepresentations to be disseminated to the consuming public. (Id.) And in alleging EMV concealed such endorsement deals, the FAC plausibly alleges that EMV aided and abetted Dr. Oz in the wrongdoing. EMV's knowledge that Dr. Oz's statements on his show were false can be plausibly inferred from the nature of their relationship. Wyatt v. Union Mortgage Co., 24 Cal. 3d 773 (1979) (holding that "knowledge may be inferred from the nature of the acts done, the relation of the parties.").

As to the scienter requirement, the FAC alleges that EMV publicizes to prospective brand partners that "products referenced by Dr. Oz consistently see significant boosts in sales" on its website. (FAC at 19.) It is plausible that any prudent business partner or representative of Dr. Oz that solicits endorsement deals on his behalf would be charged with the knowledge that Dr. Oz's repeated disavowals of such endorsement deals constitute a breach of duty to those harmed by such representations. (Id.) In other words, since the FAC allows for one to conclude that "[EMV] was aware of [the] use to which the information would be put and supplied it for that purpose," Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998), EMV's fraudulent intent can be plausibly inferred. In addition, the allegation that "Plaintiffs justifiably relied on the statements made by Dr. Oz because he assured consumers that he does not endorse a specific brand" is sufficient to plead actual reliance. (Id. at 61.) As to damages, because the existence of EMV allows for the plausible inference that Dr. Oz's repeated denials of any weight-loss supplement endorsement deals between 2012 and 2014 were false, the resulting profits could plausibly constitute ill-gotten gains from which claims for unjust enrichment can arise. (FAC at 4, 39.) The FAC, therefore, adequately alleges causation and damages to sustain the inference that EMV participated in fraud, either intentionally and directly or negligently and contributorily. [9]

Indeed, the allegations are also sufficient to state a claim against EMV for negligent misrepresentation because the existence of a special duty to Plaintiffs can be plausibly inferred

---

[9] EMV also attacks the form of the complaint under Rule 8. (Dkt. No. 98-1, 11, 12) ("The FAC lacks facts of EMV's wrongdoing, fails to provide fair notice about what it must defend, and asserts frivolous notions. Plaintiffs have not complied with Rule 8."). The Court disagrees. Plaintiffs have set out the elements of their claims and specified EMV's alleged role with respect to each claim to adequately put EMV on notice.

from the profits EMV allegedly reaps from Dr. Oz's purported endorsement deals. This duty runs to Plaintiffs because without individuals justifiably relying on Dr. Oz's recommendations or representations, EMV would have nothing of value to offer to potential clients. Accordingly, EMV's Motion to Dismiss is DENIED in its entirety.[10]

### b. Media Defendants

Plaintiffs satisfy the pleading requirements of Rule 12(b)(6) and Rule 9(b) to state a claim for fraud and negligent misrepresentation against ZoCo and Harpo because the FAC alleges ZoCo and Harpo either provided substantial assistance to, aided and abetted, employed, entered a joint venture and/or were involved in a civil conspiracy with Dr. Oz, and either one of the Labrada Defendants or the Supplier Defendants. The allegations of Sony's direct participation, however, are lacking. As such, Plaintiffs' claims against Sony that require a showing of actual knowledge and intent are inadequately pled and Plaintiffs can only state a claim against Sony if the allegations are sufficient to sustain the inference that Sony was involved in a conspiracy or joint venture.

As to ZoCo, there are sufficient allegations to infer that ZoCo provided "substantial assistance to Dr. Oz in carrying out the branded integration marketing strategy for Labrada products on The Dr. Oz Show" and (b) had knowledge of Dr. Oz's wrongdoing. (FAC at 20.) Plaintiffs allege that ZoCo produces The Dr. Oz Show and manages its website. (Id.) That an archived page of The Dr. Oz Show website purportedly displays the Svetol trademark along with the statements made by a spokesperson for Naturex is sufficient to allege that ZoCo "promotes and markets the Labrada products (and/or their proprietary active ingredients) across the United States." (Id. at 21.) Furthermore, because ZoCo is alleged to control the website, the Meratrim video Plaintiffs allege was posted therein is sufficient to state a direct claim against ZoCo for

---

[10] The Court declines to separately address the sufficiency of allegations against EMV for Plaintiffs' UCL and FAL claims because if the allegations are sufficient to state a claim for fraud and sufficient to infer either EMV's direct participation or its liability as principal, aider and abettor, joint venturer or co-conspirator, then Plaintiffs have adequately alleged their statutory unfair competition, unfair business, and false advertising claims against EMV. See, e.g., People v. Forest E. Olson, Inc., 137 Cal. App. 3d 137 (1982) (imposing a duty of communication among departments in a corporate setting under California Business and Professions Code section 17500); People v. Bestline Products, Inc., 61 Cal. 3d 879, 918 (1976) (explaining that secondary liability exists as to those who induce others to commit a section 17200 violation); Id. ("[One who] furnishes the means for [the] accomplishment [of a fraud] is liable equally with those who actually make the misrepresentation."); People v. Conway, 42 Cal. 3d 875, 886 (1974) (upholding criminal conviction of the president of an automobile dealership based in part on false and misleading statements made by his employees because the president "was in a position to control the activities of the dealership and thus could be held criminally liable for false advertising.").

negligent misrepresentation. (Id. at 41.) [11] An agency relationship can plausibly be inferred from Dr. Oz's @ ZoCo business email address at the pleading stage so any of the false or misleading statements Dr. Oz made while acting within the scope of this agency relationship could plausibly render ZoCo vicariously liable. In brief, these allegations support a plausible inference that ZoCo directly participated in the tortious conduct, had actual knowledge that Dr. Oz was breaching a duty to consumers, and provided substantial assistance to Dr. Oz and his co-defendants in this endeavor.

In contrast, the FAC fails to sufficiently allege Harpo's direct liability. That Harpo is ZoCo's parent company does not allege Harpo's direct participation in "promot[ing] and market[ing] the Labrada products" with sufficient particularity under Rule 9(b). (FAC at 21.) Nonetheless, the allegations are sufficient to reasonably infer that Harpo may be vicariously liable for ZoCo and Dr. Oz's tortious conduct as principal.  As principal, Harpo "is liable for an agent's misrepresentations or other frauds that cause pecuniary loss to a third party, when the agent acts within the scope of his authority." In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936 (N.D. Cal. 2014). Indeed, the facts alleged in the FAC allow for a plausible inference that Harpo is in a position to directly control the acts of its agent, Dr. Oz, since Harpo holds and produces copyright, "creates and develops original TV programming," and "control[s] any broader joint venture/web project with Dr. Oz." (FAC at 22.)

The allegations of control allow for the inference of a duty on the part of Harpo to the show's viewers for purposes of Plaintiffs' negligent misrepresentation claim. The FAC also plausibly alleges that Harpo has profited from Dr. Oz's tortious endorsement deals. As the alleged holder of the intellectual property rights to The Dr. Oz Show, one can reasonably infer that Harpo stands to gain the most from using the show as a subliminal advertising platform for deceptively marketed weight-loss supplements. Plaintiffs' allegations may sustain a reasonable inference that Harpo, ZoCo, and Dr. Oz share a "a community of interest in object of undertaking." Goldberg v. Paramount Oil Co., 143 Cal. App. 2d 215 (1956).  Ultimately, the existence of a joint enterprise depends on the intentions of the parties. See Preach v. Monter Rainbow, 12 Cal. App. 4th 1441 (1993).  Since the existence of a joint enterprise is a factual determination, and Plaintiffs' allegations suggest more than a mere possibility of concerted conduct, dismissing on this basis is premature. The Court, therefore, DENIES Media Defendants' Motion to Dismiss Plaintiffs' fraud claims against ZoCo and Harpo.

As to Sony, Plaintiffs allege that Sony and Harpo agreed "to collaborate on a website and digital extensions" where Sony was to "provide marketing, legal/business affairs, finance, and other back office services." (Opp. 1 at 18.) Plaintiffs attached an alleged Distribution Agreement between Sony and Harpo in support. (Id.) The Distribution Agreement, however, does not sufficiently allege Sony's direct involvement in the web marketing of The Dr. Oz show for Sony to be liable for Dr. Oz's misrepresentations. The Distribution Agreement states: "Harpo will control any broader joint venture/web project with Dr. Oz but Harpo acknowledges Sony's

---

[11] Plaintiffs allege that Meratrim is "trademarked proprietary ingredient that [sic] marketed and sold by Defendant Interhealth." (FAC at 41.)

strong interest in partnering on a Dr. Oz branded new media venture and will discuss with Sony in good faith meaningful opportunities to participate." (Id.) While the agreement evincing a distribution deal to promote the show on various platforms is sufficient to show the existence of a partnership, it is insufficient to allege that Dr. Oz's fraudulent promotion of the Products fell within the partnership's business activities. Relatedly, for liability to be imputed to Sony as a joint venturer, Sony must have equal control rights over Dr. Oz's conduct as the other Media Defendants. See Goldberg v. Paramount Oil Co., 143 Cal. App. 2d 215 (1956). Harpo's acknowledgment of Sony's "strong interest" in partnering on a Dr. Oz branded new media venture does not sufficiently allege that Sony and Harpo "had equal rights to direct and govern the conduct of each other" with respect to the promotion or content of The Dr. Oz Show. Because the Distribution Agreement suggests that Sony does not have equal control over The Dr. Oz Show, or even a fiduciary relationship to the other Defendants, the absence of other particularized allegations against Sony precludes a reasonable inference that Sony participated in a joint enterprise to further Dr. Oz's fraudulent scheme.

The FAC also fails to sufficiently allege that Sony aided and abetted the other Defendants or participated in a conspiracy to defraud The Dr. Oz show viewers. Even assuming Sony provided financial or marketing assistance to The Dr. Oz Show, substantial assistance is insufficient for fraud without actual knowledge. See Bestline Products, Inc., 61 Cal. 3d at 918. Even though a plaintiff can prove the requisite "agreement" without necessarily demonstrating an express plan to commit a tortious act, the allegations are insufficient to reasonably infer that Sony knew Dr. Oz's conduct "constituted a breach of duty to plaintiff and gave substantial assistance or encouragement" to that end. Navarrete v. Meyer, 237 Cal. App. 4th 1276 (2015). That "Defendants Sony, Harpo, and Zoco also join Doctor Oz as co-owners of the Sharecare website," which is co-owned by Dr. Oz and a Naturex spokesperson, alleges Sony's involvement only by mere association. (FAC at 46.) While Sony's alleged ownership interest in a website jointly owned by Defendants here may present a possible conflict of interests, it is equally as consistent with a coincidental arms-length relationship between passive and dispersed minority owners as it is with a "close and even fiduciary relationship" between coconspirators to join their efforts to defraud American consumers. The Court would need to speculate to infer Sony's direct involvement in, or awareness of a conspiracy to promote ineffective weight-loss supplements.

As such, the Court finds that Sony's involvement is alleged only by Sony's mere association with the other defendants, which cannot support fraud or negligent misrepresentation claims under Rule 12(b)(6) or Rule 9(b). Plaintiffs allegations would need to show either a more direct relationship of control or that Sony was put on notice of Dr. Oz's improper activities and then took some affirmative act to further his wrongdoing. The allegations, therefore, fall short of plausibly alleging Sony's participation in a joint enterprise or civil conspiracy. The allegations are also inadequate to sustain a claim against Sony premised on an agency relationship, for aiding and abetting, furnishing the means or providing substantial assistance to Dr. Oz. Accordingly, Plaintiffs' claims against Sony are DISMISSED.

## IV. CONCLUSION

As such, the Court GRANTS IN PART and DENIES IN PART Media Defendants' Motion to Dismiss as follows:

- Plaintiffs' claims against Sony are DISMISSED WITH PREJUDICE;
- Plaintiffs' claims against Dr. Oz, EMV, ZoCo, and Harpo for Fraud, Negligent Misrepresentation, violations of the UCL and FAL under California Law and violations of the analogous New York consumer protection statutes remain with the Court.

**IT IS SO ORDERED.**