UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 16-00189 JGB (SPx)** | Date | July 31, 2017 |
|---|---|---|---|
| Title | ***Veda Woodard v. Lee Labrada et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order: (1) DENYING InterHealth Neutraceuticals, Inc. and Naturex, Inc's Motions to Dismiss (Dkt. Nos. 99 & 101); (2) DENYING Naturex, Inc.'s Motion to Strike (Dkt. No. 102); and (3) DENYING Lee Labrada, Labrada Bodybuilding Nutrition, Inc., Labrada Nutritional Systems, Inc.'s (collectively, "Labrada Defendants") Motion to Dismiss (Dkt. No. 105.)**

Before the Court are: (1) a Motion to Dismiss filed by Defendant InterHealth Neutraceuticals, Inc. ("InterHealth") and a Motion to Dismiss filed by Naturex, Inc. ("Naturex") (collectively, the "Supplier Defendants") (Dkt. Nos. 99 & 101); (2) a Motion to Strike by Defendant Naturex (Dkt. No. 102); and (3) a Motion to Dismiss filed by Lee Labrada, Labrada Bodybuilding Nutrition, Inc., Labrada Nutritional Systems, Inc., (collectively, "Labrada Defendants"). (Dkt. No. 105.) The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers timely filed in support of and in opposition to the motions, the Court: (1) DENIES IntraHealth Neutraceutical's and Naturex's motions to dismiss; (2) DENIES Naturex's Motion to Strike; and (3) DENIES Lee Labrada, Labrada Bodybuilding Nutrition, Inc., and Labrada Nutritional Systems, Inc.'s Motion to Dismiss.

## I. BACKGROUND

On February 2, 2016 plaintiff Vera Woodard ("Plaintiff"), a California resident, filed a putative class action complaint against Lee Labrada, Labrada Bodybuilding Nutrition, Inc., Labrada Nutritional Systems, Inc., ("Labrada Defendants"), Naturex, Inc., InterHealth Nutraceuticals Inc., (the "Supplier Defendants"), and the Media Defendants (collectively, "Defendants"). (Dkt. No. 1.) In her initial complaint, Woodard asserted eight claims arising from Media Defendants' alleged misrepresentations surrounding the

effectiveness of weight loss supplements manufactured by the Labrada Defendants that contain active ingredients sold by InterHealth and Naturex, the Supplier Defendants. (Dkt. No. 1.)  The complaint also alleged claims against the Labrada Defendants and the Supplier Defendants for affirmative misrepresentations on the labels and advertisements of the Labrada weight-loss products and the proprietary active ingredients therein. (Id.)

Plaintiffs filed their First Amended Complaint on June 2, 2016.  ("FAC," Dkt. No. 88.)  The FAC adds two more plaintiffs—New York residents Teresa Rizzo-Marino and Diane Morrison—as well as Defendant Entertainment Media Ventures ("EMV"). (Id.)  The FAC also adds statutory claims for unfair business practices and false advertising (N.Y. Gen. Bus. Law § § 349, 350), and breach of warranty claims under New York law (N.Y. U.C.C. § § 2-313, 2-314). (Id. at 74-75.)  InterHealth and Naturex filed their motions to dismiss on July 15, 2016. ("MTD1," Dkt. No. 99; "MTD2," Dkt. No. 101.)  The Labrada Defendants filed their motion to dismiss on July 21, 2016.  ("MTD3," Dkt. No. 105-1.)

Naturex also filed a Motion to Strike on July 15, 2016, ("MTS," Dkt. No. 102), and a Request for Judicial Notice, (Dkt. No. 103), asking the Court to take judicial notice of: (a) various studies on the Green Coffee Bean Extract and Chlorogenic Acid (id. at Exs. A, B, G & H-N); as well as (b) the Aloudi v. Intramedic Research Grp., LLC., (id. at Exs. C-E), and the Reed v. NBTY, Inc. et al. decisions.[1]  (Id.)  On September 3, 2016, Plaintiffs opposed the Supplier Defendants' motions, ("Opp. 1," Dkt. No. 113; "Opp. 2," Dkt. No. 112), and Naturex's Motion to Strike. (Dkt. No. 111.) On September 9, 2016, Plaintiffs filed an Opposition to the Labrada Defendants' Motion. ("Opp. 3," Dkt. No. 116.) InterHealth, Naturex, and the Labrada Defendants filed replies to Plaintiffs' oppositions on September 23, 2016. ("R1," Dkt. No. 118; "R2," Dkt. No. 120; "R3," Dkt. No. 119.)

## II. FACTUAL ALLEGATIONS

---

[1] Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).  An adjudicative fact may be judicially noticed if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Since the studies in question go to the heart of the dispute, and are neither "generally known within the territorial jurisdiction" nor subject to ready determination by resort to unquestionably accurate sources, they do not fall within the ambit of adjudicative facts that may be judicially noticed. Rodgers v. Horsely, 123 F. App'x 281, 285 (9th Cir. 2005)(finding that the district court abused its discretion by taking judicial notice of the status of unnamed parties to a litigation because this determination is a disputed adjudicative fact and "not within the realm of judicially noticeable facts"); Allen v. Hyland's Inc., 300 F.R.D. 643 (C.D. Cal. 2014).  As far as the Aloudi and Reed decisions, it is not necessary for the Court to grant Naturex's Request for Judicial Notice for the decisions to bear on the Court's resolution of Defendants' motions.  Thus, the Court DENIES Naturex's Request for Judicial Notice of Exhibits A through N in Support of its Motion to Dismiss.  (Dkt. No. 103.)

The FAC asserts claims relating to certain representations made by Defendants regarding the quality, effectiveness, and sponsorship of weight loss supplements manufactured by the Labrada Defendants and contains the following allegations. Plaintiffs Veda Woodard, Teresa Rizzo-Marino, Diane Morrison, and putative class members all purchased Labrada brand weight-loss products. (FAC at 13-14.) Specifically, Plaintiffs bought either or both of the Labrada Garcinia Cambogia DUAL ACTION FAT BUSTER and Labrada Green Coffee Bean Extract FAT LOSS OPTIMIZER, (the "Labrada Products" or the "Products"), on multiple occasions. (Id.) The supplements can be purchased online or at vitamin shops nationally. (Id. at 12.) Supplier Defendant, Naturex, manufactures and holds the trademark for the Svetol product, which is the active ingredient in the Labrada Green Coffee Bean Extract FAT LOSS OPTIMIZER. (Id. at 6.) InterHealth manufactures and holds the trademark to the SuperCitrimax product, which is the active ingredient in the Labrada Garcinia Cambogia DUAL ACTION FAT BUSTER. (Id.)

Naturex allegedly advertises Svetol as the "most studied and proven green bean extract." (Id.) Naturex attributes its effectiveness to the "100% premium Robusta beans," processed to yield a "high concentration of key chlorogenic acids." (See id.) InterHealth, producer of SuperCitrimax, markets its product through a powerful "co-branding strategy." (Id.) InterHealth shores up its claim that SuperCitrimax provides "maximum stability, solubility, bioavailability, and efficacy" by characterizing the extract as "60% all natural HCA derived from the Garcinia Cambogia fruit." (Id.)

Labrada products are advertised as "clinically proven" "FAT BUSTERS" that contain "ZERO BINDERS, ZERO FILLERS, AND ZERO ARTIFICIAL INGREDIENTS." (Id. at 7.) Moreover, they are purported to "support significant weight loss"—a claim Labrada reinforces by citing "peer reviewed, published" scientific studies on its labels. (Id.) Notably, the labels reference the Vinson Study to substantiate the claim that the supplement aids in significant weight loss. (Id. at 8.) According to Plaintiffs, the Vinson Study was later "retracted by the authors after data was found to be falsified." (Id. at 43.)

The FAC alleges that the representations made by Defendants on the product labels are false or misleading. Specifically, Plaintiffs claim that Defendants' inclusion of the statement "ZERO FILLERS, ZERO BINDERS, ZERO ARTIFICIAL INGREDIENTS" on the Labrada Product labels is fraudulent because the supplements contain artificial ingredients. (Id. at 30.) In fact, according to Plaintiffs, the SuperCitrimax produced by InterHealth is not all natural, but rather, a synthetic form of hydroxycitric acid ("HCA"). (Opp. 3 at 15.) Plaintiffs also allege that Defendants misrepresented the quantity of active ingredients in the Labrada Products, (FAC at 30), the origin of the ingredients ("Made in the USA"), (id. at 31-32), and the quality of the product overall. (Id. at 24, 28, 63, 65, 73.)

The FAC also charges Dr. Oz with fraudulently promoting the Labrada Products on The Dr. Oz Show by misrepresenting his affiliations with the products he endorses. (Id. at 19.) Plaintiffs support their claims variously by, among other things, pointing to Dr. Oz's statements, espousal of studies performed by Supplier Defendants' paid researchers on his show, and representations on his website. (Id. at 38-46.) For instance, the FAC states that Dr. Oz relied on the Vinson

Study when he touted the magic of the Green Coffee Extract as a weight-loss aid. (Id.) He also described that study as "good quality" during the Senate Hearing on "Protecting Consumers from False and Deceptive Advertising of Weight-Loss Supplement Products." (Id. at 1-2, 9.)

After watching Dr. Oz's shows in 2012, during which Dr. Oz pronounced the weight-loss benefits of Green Coffee Bean Extract and Garcinia Cambogia, Plaintiffs purchased these products on multiple occasions spanning 2013 and 2014. (Id. at 12-13.) Plaintiffs maintain they were undeterred by the true nature of these products because the labels contained the same representations made by Dr. Oz regarding the quality and effectiveness of the ingredients. (Id. at 40.)

Even if Plaintiffs were not yet convinced that the Labrada Products were all natural, fully-American antidotes to hunger and obesity, the labels on the Labrada products cited the studies that Dr. Oz referred to on his show or that were conducted by Dr. Oz Show guests. (Id.) Plaintiffs claim that "as a renown [sic] surgeon at Columbia University Medical School," Dr. Oz knew or "should have known that the supplement products he promoted were ineffective at providing weight-loss benefits." (Id.) Plaintiffs also maintain that Dr. Oz knew or should have known that the studies did not meet any of the standards for scientific research to be accepted in the medical community. (Id. at 42.)

Plaintiffs allege that Dr. Oz had scientists on his show who were undisclosed paid spokespersons for InterHealth and Naturex. (Id.) What's more, Plaintiffs allege that Dr. Oz represented paid spokespersons for the Products to be doctors or scientists when they had no such credentials. (Id.) For instance, The Dr. Oz Show's producers allegedly invited "Dr." Lindsey Duncan on the show as a weight-loss specialist. (Id.) Since he was not a real doctor, he was allegedly provided a script edited to include the key words to use to find the product he was pushing: a product allegedly manufactured by Naturex. (Id.) Plaintiffs describe how Duncan was able to ride the coattails of the "Oz effect," just like the Defendants in this action, by dressing his unsubstantiated claims in the pretense of medical truth to exploit the palpable advantage the power of medicine has in the marketplace—an advantage that resides in the naiveté of the average consumer and the trust consumers place on their doctor's advice. (Id. at 9, 46.)

According to Plaintiffs, this trust is why consumers believe Dr. Oz when he denies he endorses any specific brands or products. (Opp. 3 at 3; FAC at 4.) And the Director of Research at Naturex remarked that Dr. Oz's praise of Green Coffee Bean Extract has dramatically increased its sales with existing customers and "capture[d] the interest of new consumers." (FAC at 10.) The Naturex employee not only described this increase in sales as the "Oz effect," but also forecasted this effect on sales would be "long term." (Id.)

On those bases, Plaintiffs allege Defendants entered a joint venture to employ "deceptively formatted advertisements" to exploit information asymmetries between consumers and the "doctors" and "researchers" they pay to substantiate the effectiveness of their products. (Id. at 10.) In this way, Plaintiffs allege that the manufacturer (i.e., Labrada Defendants) and suppliers (i.e., InterHealth & Naturex) are able to harness the trust that viewers vest in "America's

Doctor" to capitalize on Dr. Oz's experience and credentials, while Dr. Oz can further monetize his medical degree by representing that his recommendations are the product of unbiased professional judgment. (Id. at 11.) But Plaintiffs allege that these undisclosed product placements constitute illegal "payola" in violation of the Federal Communications Commission's ("FCC") payola disclosure requirements. (Id.) The FAC further claims that each of these defendants aided and abetted one another, acted as each other's agents, and substantially assisted in the fraudulent and tortious wrongdoing that is the alleged objective of their scheme. (Id.)

Plaintiffs maintain that Dr. Oz is able to enter into these surreptitious endorsement deals through strategic partnerships that are generated through the joint efforts of the Media Defendants. (Id. at 19.) Plaintiffs allege the Media Defendants aid Dr. Oz in concealing these arrangements and ill-gotten gains through various shell entities. (Id.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

Surviving a motion to dismiss requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Rule 9(b) presents heightened pleading requirements for plaintiffs alleging fraud or mistake. In alleging fraud or mistake, the plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Failure to satisfy this heightened pleading requirement can result in dismissal of the claim. Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003). In general, the plaintiff's allegations of fraud or mistake must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Id. at 1106; Swartz v. KPMG LLP, 476 F.3d 756 (9th Cir. 2007)("In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme to satisfy the fraud pleading rule."). This heightened pleading standard requires the plaintiff to allege fraud or mistake by detailing "the who, what, when, where, and how" of the misconduct charged. Id. at 1106-07. In other words, the plaintiff must specify the time, place, and content of the alleged fraudulent or mistaken misconduct. See id.

Although the scope of review on a Rule 12(b)(6) motion to dismiss is limited to the contents of the complaint, the Court may consider certain materials, such as documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. United States v. Ritchie, 342 F.3d 903, 907-08 (9th Cir. 2003). Under the incorporation by reference doctrine, the Court may consider documents not attached to the pleading if: (1) those documents are referenced extensively in the complaint or form the basis of the plaintiff's claim; and (2) if no party questions their authenticity. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

**B. Secondary Liability**

All persons concerned in the commission of a tort may be joined as defendants, or may be sued separately. Rogers v. Ponet, 21 Cal. App. 577 (1913). The California courts have recognized six forms of secondary liability: aiding and abetting or "furnishing the means," agency or respondeat superior, alter ego or joint enterprise, and conspiracy. The Court discusses each form of secondary liability in turn.

Liability may be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. Saunders v. Superior Court, 27 Cal. App. 4th 832, 846 (1994); Sheehy v. New Century Mortgage Corp., 690 F. Supp. 2d 51 (E.D.N.Y. 2010). "[I]naction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." Sheehy, 690 F. Supp. 2d at 51.

An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410-11 (Cal. Ct. App. 2007). Once an agency relationship is established, the principal can be held liable for the acts of its agent. Von Beltz v. Stuntman, Inc., 207 Cal. App. 3d 1467, 1488 (Cal. Ct. App. 1989); accord In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936 (N.D. Cal. 2014)(explaining that under New York law, an agent may bind his principal in matters within the scope of his agency, "and the principal is liable for an agent's misrepresentations or other frauds that cause pecuniary loss to a third party.").

A joint venture is "an undertaking by two or more persons jointly to carry out a single business enterprise for profit, and requires a community of interest." Goldberg v. Paramount Oil Co., 143 Cal. App. 2d 215 (1956). The doctrine of joint enterprise, or alter ego liability, is applied when one corporation uses another to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose; in these situations, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. Gopal v. Kaiser Found. Health Plan, Inc., 248 Cal. App. 4th 425 (2016), as modified (June 23, 2016). To determine whether a joint enterprise exists, courts look to see if the parties have "equal rights to direct and govern the conduct of each other with respect thereto," "[a] joint proprietary interest and right of mutual control over the subject matter of the enterprise," and "a close and even" fiduciary relationship. Id. The intent of the parties is the most decisive factors courts look to in determining whether a joint venture exists. Preach v. Monter Rainbow, 12 Cal. App. 4th 1441 (1993). Where evidence is in dispute, the existence or nonexistence of a joint venture is a question of fact to be decided at trial. Id.

To establish a civil conspiracy, Plaintiffs must show: (a) an agreement among the alleged conspirators to commit a tortious act (formation and operation of the conspiracy); (b) the tortious act(s) committed pursuant to the agreement; and (c) resulting damage to the Plaintiffs. Wyatt v. Union Mortgage Co., 24 Cal. 3d 773 (1979). Civil conspiracy is not a separate cause of action; it merely "imposes liability on persons whom, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its preparation." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11 (1994). And "[p]ersonal liability, if otherwise justified, may rest upon a conspiracy among officers and directors to injure third parties through corporation." Wyatt, 24 Cal. 3d 773. Courts apply Rule 9(b)'s heightened pleading standard to claims of civil conspiracy where the object of the conspiracy is to commit fraud. See Wasco Prods., Inc., v. Southwall Techs., Inc., 435 F.3d 989, 990-91 (9th Cir. 2006).

That said, the Ninth Circuit has explained that "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007); Id.

### III. DISCUSSION

## A. Common Law Claims

The Labrada Defendants assert that Plaintiffs cannot satisfy Rule 9(b)'s heightened pleading standard because: (a) Plaintiffs fail to plead with particularity which statements were false and how they were false; (b) Plaintiffs fail to allege the specific statements on which they actually relied; and (c) Plaintiffs fail to identify which defendant made allegedly fraudulent statements, and "lumping of defendants" is not permitted under Rule 9(b).  (MTD3 at 13.)

The Labrada Defendants take issue with the sufficiency of the following statements for purposes of alleging fraud, negligent misrepresentation, unfair competition, and false advertising:

- "Recent peer-reviewed, published studies have found that Green Coffee Bean Extract: Helps Support Significant Weight Loss" (FAC at 35);
- The Products contain "Zero Fillers, Zero Binders, and Zero Artificial Ingredients'" (Id. at 36);
- The Products are "Made in the USA" (Id. at 37); and
- The Products "contain 'standardized' amounts of ingredients." (Id. at 35-36.)

With respect to the Vinson Study, the Labrada Defendants argue that since Plaintiffs cannot show that they knew that the study was retracted, Plaintiffs fail to allege the requisite intent to state a claim for fraud.  (MTD3 at 5-6.)  The Labrada Defendants further maintain that Plaintiffs must adequately allege the Products are ineffective to state a claim, and the FAC lacks sufficient factual allegations to sustain the inference that the products are ineffective.  (Id. at 1.)

For instance, the Labrada Defendants argue that the allegations regarding the quantity of HCG that depend on the test by the consumer advocacy group fail to state a claim for two reasons: (1) the consumer advocacy group only tested a single lot of Labrada Garcinia Cambodia, and (2) Plaintiffs cannot show that they purchased from that lot.  (Id.)  Similarly, the Labrada Defendants argue that the alleged falsity of the "Made in the USA" claim on the Products' labels cannot support Plaintiffs' fraud claims because Plaintiffs have failed to allege actual reliance on that statement.  (Id. at 2.)

InterHealth and Naturex both maintain that they cannot be liable as a matter of law without Plaintiffs adequately alleging that they made false statements or that they had a duty of disclosure to Plaintiffs and actual reliance.  (See, e.g., MTD1 at 2.)  The Supplier Defendants, therefore, argue that Plaintiffs' allegations lack the requisite particularity under Rule 9(b).  (MTD1 & 2 at 2.)

To disclaim any secondary liability for the false or deceptive statements on the Labrada product labels, the Supplier Defendants aver that Plaintiffs "allege no facts indicating that [either] InterHealth [or Naturex] made any decision to participate in any of the alleged wrongful conduct of the other defendants in regard to the packaging, labeling, marketing, advertising and sale of The Products."  (MTD1 & MTD2 at 9, 2.)  In so doing, the Supplier Defendants reject the relevance of the sample licensing agreements to Plaintiffs' fraud claims because Plaintiffs have no basis to believe that the sample licensing agreement was entered into by the Labrada Defendants and either Supplier Defendant.  (MTD1 & 2 at 8, 2.)

### 1. Legal Standard

Elements of cause of action for fraud in California and New York are: (1) misrepresentation, (for example, false representation, concealment, or nondisclosure); (2) knowledge of falsity, or scienter; (3) intent to defraud, (that is, to induce reliance); (4) justifiable reliance; and (5) resulting damage.  Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861 (N.D. Cal. 2012); accord Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998).

A failure to disclose a fact can constitute actionable fraud or deceit when: (1) the defendant is the plaintiff's fiduciary; (2) the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations that are misleading because some other material fact has not been disclosed.  Collins v. eMachines, Inc., 202 Cal. App. 4th 249 (Cal. Ct. App. 2011), as modified (Dec. 28, 2011); Martian Entm't, LLC v. Harris, 12 Misc. 3d 1190(A), 824 N.Y.S.2d 769 (2006) ("A failure to disclose or omission, the plaintiff must allege a confidential or fiduciary relationship giving rise to a duty to speak.").

To allege a claim for negligent misrepresentation, a plaintiff must plead: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc., 196 Cal. App. 4th 1559, 1573 (2011) (citation and internal quotation marks omitted).  Still, "[t]he existence of a duty of care is necessary to support a negligent misrepresentation claim."  Jackson v. Fischer, 931 F.Supp.2d 1049, 1068 (N.D. Cal. 2013) (citations omitted); Marcus, 138 F.3d at 46.

### 2. Analysis

#### a. Labrada Defendants

Plaintiffs state a claim for fraud against the Labrada Defendants under Rule 9(b) and Rule 12(b)(6) because Plaintiffs sufficiently allege that the Labrada Defendants: (a) made affirmative misrepresentations or fraudulent omissions; (b) had knowledge (or a duty to have knowledge) that these representations were false; and (c) intended to induce Plaintiffs' reliance in making those fraudulent misrepresentations or omissions.

Taking the Plaintiffs' allegations as true, the Court can reasonably infer that the statements on the Labrada Product labels are fraudulent misrepresentations.  Plaintiffs have sufficiently alleged the falsity of all of the statements in the FAC regarding the contents of the Labrada Products, the quantity and quality of their active ingredients, their sponsorship, their origin, and their effectiveness.  For instance, the FAC alleges that the Labrada Products contain fillers and artificial ingredients so the statement "ZERO FILLERS, ZERO BINDERS, ZERO ARTIFICIAL INGREDIENTS" is plausibly false.  (Opp. 3 at 15-15.)

To survive a motion to dismiss, Plaintiffs need not allege that they actually purchased from the lot of Labrada products found to fall below the concentration of active ingredient advertised on the labels.  Anderson v. Hain Celestial Grp., Inc., 87 F. Supp. 3d 1226 (N.D. Cal. 2015).  All that must be alleged is that the products are "substantially similar" to those tested by the Consumer Advocacy Group.  (FAC at 35.)  Plaintiffs have satisfied the substantially similar threshold requirement.

Defendants' alleged failure to disclose the facts surrounding the studies cited on the Labrada product labels is also sufficient to state a claim for fraudulent omission or concealment because stating that the effectiveness of the product is supported by clinical studies is misleading without disclosing that: (a) the Vinson Study was retracted, and therefore no longer "published,"; and (b) the other studies were either paid for or performed by a spokesperson of the Supplier Defendants.  (Opp. 1 at 2.)  See Klein v. Chevron U.S.A., 202 C.A. th 1342, 1382 (2012) ("Fraud or deceit may consist of the suppression of a fact by one who ... gives information of other facts which are likely to mislead for want of communication of that fact.").

The retraction of the Vinson Study is sufficient to state a claim for fraudulent omission.  Plaintiffs do not need to further allege that Labrada knew that the study was retracted because it is plausible to infer that Labrada had a duty to ensure the accuracy of representations displayed on its product labels.  See Collins, 202 Cal. App. 4th at 249.  The retraction is also sufficient to state a claim for negligent misrepresentation because by continuing to use the Vinson Study to promote the Products, the Labrada Defendants misrepresented an existing material fact "without reasonable ground for believing it to be true."  Wells Fargo Bank N.A. v. FSI, Fin. Solutions, Inc., 196 Cal. App. 4th 1559, 1573 (2011).  With respect to the statement that the products contain "ZERO FILLERS, ZERO BINDERS, and ZERO ARTIFICIAL INGREDIENTS," Plaintiffs face a lower pleading burden to sufficiently allege Labrada's intent and knowledge because the falsity of this fact is "peculiarly within the opposing party's knowledge."  Weaver v. Chrysler Corp., 172 F.R.D. 96, 101 (S.D.N.Y. 1997).

Plaintiffs argue that "Defendants actively concealed the truth about the products by not disclosing all facts about the studies supposedly supporting the Products or by making such studies difficult or impossible to discover."  (FAC at 3.)  This is sufficient to plead Defendants had the requisite intent.  (Opp. 3 at 18.)  A fraud by omission or fraud by concealment claim "can succeed without the same level of specificity required by a normal fraud claim."  See Baggett v. Hewlett-Packard Co., 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) ("[I]t is clear that a plaintiff in a fraudulent concealment suit will not be able to specify the time, place, and specific content of an omission" "[b]ecause such a plaintiff is alleging a failure to act instead of an affirmative act. . .").

Plaintiffs' allegation that "if they knew that the studies supporting the products were conducted by biased researchers or that the underlying data was manipulated or fraudulently presented, they would not have purchased the Products," satisfies the actual reliance requirement for stating fraud and negligent misrepresentation claims under both New York and California Law.  (FAC at 32.)  Accordingly, the Labrada Defendants Motion to Dismiss Plaintiffs' fraud & negligent misrepresentation claims is DENIED.

### b. Supplier Defendants

Plaintiffs allege that InterHealth has a high degree of control over the content that appears on products containing SuperCitrimax.  (FAC at 25) ("InterHealth must provide written approval of the packaging before any supplement containing SuperCitrimax can be sold in commerce.") Plaintiffs further allege that "InterHealth takes an active role in marketing the products by providing marketing materials to the supplement companies that sell products containing SuperCitrimax."  (Id.)

Since SuperCitrimax is the active ingredient in the Labrada DUAL ACTION FAT BUSTER, Plaintiffs' allegations that SuperCitrimax includes compounds labeled "artificial" by federal agency regulations adequately alleges that "ZERO FILLERS, ZERO BINDERS, ZERO ARTIFICIAL INGREDIENTS" is false or deceptive.  (Id. at 36.)  The degree of control InterHealth allegedly has over the packaging and promotion of products containing SuperCitrimax plausibly supports liability for misrepresentations made thereto.  In People v. JTH Tax, Inc., the court affirmed a finding of false advertising against a tax preparation franchisor based on violations made by its franchisees.  212 Cal. App. 4th 1219, 1242 (2013).

Given the right to control that Plaintiffs allege InterHealth enjoys over the content of the Products' labels, their claim that the DUAL ACTION FAT BUSTER with SuperCitrimax contains non-standardized amounts of HCA is sufficient to state a claim for fraudulent misrepresentation and omission against InterHealth as well.  (FAC at 20) (displaying the SuperCitrimax logo advertising 60% HCA); (Id. at 35) (describing the test results yielding only a 49% concentration of HCA).  In addition, the inference of InterHealth's direct involvement is bolstered by the allegation that one of the two studies cited on the Labrada label was co-authored by InterHealth's paid researcher.  (Opp. 1 at 2.)

The allegations also plausibly support InterHealth's intent, knowledge or its duty to Plaintiffs.  A provision of the licensing agreement requires licensees to "display the SuperCitrimax Trademark on all labeling, advertisements, promotional materials, to clearly associate required labeling statements with SuperCitrimax."  (Id. at 3.)  At any rate, alleging InterHealth posted a promotional video for the Labrada DUAL ACTION FAT BUSTER on its own website would be sufficient for direct liability.  (FAC at 7.)  Plaintiffs also plausibly state a claim against InterHealth on a theory of vicarious liability for its own spokespersons' fraudulent statements under agency principles—including Dr. Oz's affirmative misrepresentations while promoting InterHealth's products, and the statements of Dr. Preuss, its spokesperson.  (Opp. 3 at 5.)  The Meratrim video posted on Dr. Oz's website plausibly establishes InterHealth decided to participate in the alleged wrongful conduct of the other defendants.  These allegations make it plausible to infer an endorsement deal between Dr. Oz and InterHealth to state a claim for joint enterprise liability.

In short, these allegations taken together are sufficient to plead that InterHealth made affirmative misrepresentations, had actual knowledge of the misrepresentations made by the Labrada Defendants and its own employees or spokespersons, and intended for consumers to rely

on these representations.  The allegations against InterHealth contained in the FAC, therefore, satisfy the particularity requirement of Rule 9(b) since InterHealth is put on notice of its direct involvement in the fraudulent scheme.  See Cardenas v. NBTY, Inc., 870 F. Supp. 2d 984 (E.D. Cal. 2012).

As to Naturex, Plaintiffs sufficiently allege it had knowledge of, and authorized the misrepresentations on the Products' labels to adequately state a claim for fraud.  Plaintiffs allege that the front label of the Labrada "FAT LOSS OPTIMIZER" displays the Svetol Trademark as its active ingredient.  (FAC at 26.)  Plaintiffs attach a sample licensing agreement that requires Licensees (i.e., Labrada) to agree to submitting "samples of proposed labeling of any new product containing [Svetol] for [Naturex's] review and approval of the use of the [Svetol logo] at least 30 days before use begins."  (Opp. 2 at 3.)  The contract requires Licensees to obtain written approval of the proposed label "prior to marketing, distributing, or selling the Products" that contain Svetol.  (Id.)

Plaintiffs also sufficiently allege that the label for the "FAT LOSS OPTIMIZER" is deceptive or fraudulent since it states that it contains "45% Total Chlorogenic Acids," when it does not.  (Id. at 2.)  And since Svetol is the only active ingredient advertised on the bottle, the alleged ineffectiveness of the Labrada product is plausibly attributable to ingredients manufactured by Naturex.  The Svetol product also advertises that it contains zero binders, zero fillers, and zero artificial ingredients.  (Id.)  Plaintiffs maintain, however, that it actually contains "Silica," "Magnesium Stearate," and "Sodium Copper Chlorophyllin," which are considered artificial ingredients under federal agency regulations.  (FAC at 36-37.)

Plaintiffs' allegations support a plausible inference that Naturex intended to induce reliance, including: the scientific studies cited on the Labrada labels and referred to by Dr. Oz were financed by Naturex, the language Dr. Oz used on his show borrows the exact product descriptions Naturex uses in promoting Svetol, and the Director of Research at Naturex was quoted saying "Naturex believes the Oz effect on this ingredient will be long term."  (Opp. 2 at 5.)  These allegations reasonably support an inference that Naturex sought to affiliate its product with Dr. Oz, had knowledge of Dr. Oz's misrepresentations regarding Svetol, and benefited from these misrepresentations.  In the FTC area, courts have found liability based on the acts of independent contractors if the principal retained the benefits of the sale after knowing of the independent contractor's deceptive conduct.  Sw. Sunsites, Inc. v. F.T.C., 785 F.2d 1431 (9th Cir. 1986).

As discussed, Naturex argues that the licensing agreement cannot sustain a claim against an ingredient supplier for misrepresentations on the Labrada product labels.  However, courts addressing similar arguments for claims against dietary supplement manufacturers for false statements on product labels have sustained claims against licensors for misrepresentations made by licensees in marketing the licensor's product.  The court in FTC v. Chinery observed that licensing agreements giving the license holders advertising review of the ultimate products suggest a course of dealing involving the licensor's awareness and approval of the licensee's advertising.  F.T.C. v. Chinery, No. CIV.05-3460 GEB, 2007 WL 1959270, at *7 (D.N.J. July 5,

2007); see F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564 (7th Cir. 1989) (imposing liability on individual principals of telemarketing firms because the "principals controlled firms, wrote or reviewed telemarketing scripts that misled consumers. . ."). Plaintiffs have sufficiently alleged a degree of control sufficient to state claims for fraud and negligent misrepresentation against Naturex. Accord Amy Travel Serv., Inc., 875 F.2d at 564.

Since the standard Naturex licensing agreement plausibly alleges Naturex's knowledge and control over the labels viewed by Plaintiffs and customers, Plaintiffs' allegations that they relied on those labels in deciding to purchase the Products are sufficient to state a claim for fraud and negligent misrepresentation against Naturex. As such, Naturex's Motion to Dismiss Plaintiffs' fraud and negligent misrepresentation claims is DENIED.

**B. Statutory Claims Under California Law**

The Labrada Defendants assert that Plaintiffs fail to state a claim under the California Unfair Competition Law ("UCL") because they do not sufficiently allege that the representations on the labels are false. (R3 at 3.) They also argue that Plaintiffs do not specifically allege that a reasonable consumer would rely on the "Made in the USA" statement. (MTD3 at 2.) Clinging to a creative reading of Williams v. Gerber Prod. Co., 552 F.3d 934, 938–39 (9th Cir. 2008), the Labrada Defendants similarly argue that no reasonable consumer could be misled by "ZERO FILLERS, ZERO BINDERS. ZERO ARTIFICAL INGREDIENTS" because the ingredients were plainly disclosed on the packaging.

Supplier Defendants argue that they are not covered by the state consumer protection laws since they do not sell products to consumers. (R1 & MTD2 at 8, 2.) They also argue that they cannot be jointly liable with the Labrada Defendants because they are not "manufacturer[s], wholesaler[s], distributor[s], jobber[s], contractor[s], broker[s], retailer[s], or other vendors[s] . . ." (Id.)(citing Cal. Bus. & Prof. Code § 17048; N.Y. Gen. Bus. Law § 349).

Supplier Defendants further maintain that UCL claims cannot be premised on vicarious liability and any aiding and abetting theory of liability is insufficiently plead. (E.g., R1 at 9.) As such, Supplier Defendants argue that Plaintiffs' failure to identify specific misrepresentations made by each Supplier Defendant is fatal to their UCL claim. (MTD2 at 3.) They further contend that Plaintiffs' failure to show that the Products are in fact ineffective renders their claims impermissible lack of substantiation claims. (R2 at 6.) As to the CLRA claims, InterHealth and Naturex argue that Plaintiffs fail to state a claim because there has been no "transaction," between Plaintiffs and InterHealth/Naturex. (R1 at 12; MTD2 at 3.) Finally, Naturex takes issue with Plaintiffs representing a nationwide class in this matter because "the UCL does not apply extraterritorially." (MTD2 at 3.)

**1. FAL and UCL**

California's False Advertising Law ("FAL") prohibits any "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17500.  "This statute makes it unlawful for a business to disseminate any statement 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]'" Arevalo v. Bank of Am. Corp., 850 F. Supp. 2d 1008, 1023-24 (N.D. Cal. 2011) (internal citation omitted).  "The statute has been interpreted broadly to encompass not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public . . . ."  Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1162 (9th Cir. 2012) (internal citations, quotations, and alterations omitted); id. ("Consequently, even a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under this section.").

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The UCL provides a separate theory of liability under the "unlawful," "unfair," or "fraudulent" prongs. Stanwood v. Mary Kay, Inc., 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012) (citing Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007)).  A practice is "unlawful" if it violates a law other than the UCL.  Farmers Ins. Exch. v. Super. Ct., 2 Cal. 4th 377, 383 (1992). The UCL "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]." Id.; Clerkin v. MyLife.com, Inc., No. C 11– 00527 CW, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) ("Violation of almost any federal, state or local law may serve as the basis for a UCL claim.").  Coverage of California's Unfair Competition Law is sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law.  Cal. Bus. & Prof. Code § 17200.

To state a claim under the FAL and UCL, a plaintiff must allege the defendant's purported misrepresentations are likely to deceive a reasonable consumer.  See Williams, 552 F.3d at 938 (explaining that unless the advertisement at issue targets a particularly vulnerable group, courts must evaluate claims for false or misleading advertising from the perspective of a reasonable consumer); see also Reid v. Johnson & Johnson, 780 F.3d 952, 958 (9th Cir. 2015).  Plaintiffs' burden to state a claim under the UCL and FAL is lighter than for common law fraud.  Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 838, (2006), as modified (Nov. 8, 2006). Unlike common law fraud, a UCL violation can be shown even without allegations of actual deception, reasonable reliance and damage.  Id.  Further, to state a claim for a section 17500 violation, "plaintiff need not prove that anybody was misled."  Brockey v. Moore, 107 Cal. App. 4th 86 (2003).  All that must be shown to establish standing is "that a plaintiff have lost money or property."  Kwikset, 51 Cal. 4th at 323 (internal quotation marks omitted).

Courts have embraced common law doctrines of secondary liability to hold any person part of a common scheme to engage in unfair business practices liable.  Cal. Bus. & Prof. Code § 17201. Indeed, all parties to a conspiracy to engage in unfair business practices can be held liable, no matter who performs the offending acts.  Cal. Bus. & Prof. Code § 17048 ("It is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, *or any*

*agent of any such person, jointly* to participate or *collude* with any other such person in the violation of this chapter.") (emphasis added). Of course, "[a] claim under California's unfair competition law (UCL) cannot be predicated on vicarious liability" so to sustain a claim under the UCL, plaintiffs must allege that the defendant personally participated in the scheme, even if the defendant's conduct on its own would not satisfy the elements of the UCL. Emery v. Visa Int'l Serv. Ass'n, 95 Cal. App. 4th 952, 960 (2002).

That said, the UCL casts a wide net: potential defendants under section 17200 extend beyond the actual perpetrators of unlawful, unfair, or fraudulent acts. See, e.g., Cal. Bus. & Prof. Code § 17500 ("It is unlawful for *any person,* firm, corporation or association, or *any employee thereof* with intent directly *or indirectly* … to make or disseminate *or cause to be made* or disseminated before the public . . .") (emphasis added). And courts have held defendants liable under the UCL on agency principles, on theories of aiding and abetting, furnishing the means, and civil conspiracy. Chetal v. Am. Home Mortg., No. C 09-02727 CRB, 2009 WL 2612312, at *4 (N.D. Cal. Aug. 24, 2009) (noting that an aiding and abetting theory is available under the UCL); Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008) (allowing claims to proceed on aiding and abetting theory); People v. Sarpas, 225 Cal. App. 4th 1539, 1562 (2014) (holding that corporate owners could be liable under the UCL where owners and corporation operated as a single enterprise). Indeed, a principal can be held liable for its agent's unfair business practice if the agent acted within the scope of his authority, even when the principal does not have actual knowledge of the agent's action. JTH Tax, Inc., 212 Cal. App. 4th at 1242, 1247 ("We find no error in the court's conclusion that, '[e]ven if Liberty's franchisees are not its agents for all purposes, they are its agents at a minimum for purposes of advertising.'").

California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770. The term "transaction," as it appears in the CLRA, is defined by California Civil Code section 1761(e) [] as an "agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." Cal. Civ. Code § 1761(e). Under the CLRA, a defendant has an obligation to disclose information in four circumstances: (1) when a defendant is the plaintiff's fiduciary; (2) when defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when defendant actively conceals a material fact from the plaintiff; and (4) when defendant makes partial representations that are misleading because some other material fact has not been disclosed. Warner v. Tinder Inc., 105 F. Supp. 3d 1083 (C.D. Cal. 2015).

### 2. Analysis

Both of the arguments put forth by the Labrada Defendants—(a) that Plaintiffs are required to show that they actually relied on the "MADE IN THE USA" labels; and (b) that the "Zero Fillers, Zero Binders, Zero Artificial Ingredients" statement cannot reasonably deceive consumers because the list of ingredients is also contained on the label—are foreclosed by

---

<u>Kwikset Corp. v. Superior Court</u>, 51 Cal. 4th 310, 327 (2011), [2] and <u>Williams v. Gerber</u>, 552 F.3d 934 (9th Cir. 2008),[3] respectively.

Further, any dispute over the effectiveness of the Products and the falsity of their labels is an issue of fact that cannot be determined at the motion to dismiss stage.  <u>See</u> <u>Williams</u>, 552 F.3d at 938–39 (citing <u>Linear Technology Corp. v. Applied Materials, Inc.</u>, 152 Cal.App.4th 115, 134–35 (2007); <u>see</u> <u>Reid</u>, 780 F.3d at 952 (describing the reasonable consumer standard under the UCL, FAL, and CLRA, as raising questions of fact (and not a standing requirement) "which are appropriate for resolution on a motion to dismiss only in rare situations.").  Since the Labrada Defendants' arguments in support of their Motion to Dismiss Plaintiffs' UCL, FAL, and CLRA claims are either foreclosed by the case law or require a consideration of disputed facts, the Labrada Defendants' Motion to Dismiss the UCL, FAL, and CLRA claims is DENIED.

InterHealth claims that Plaintiffs fail to allege facts that would establish InterHealth's liability or causation in its role in the labeling, marketing, and advertising of the product at issue.  (MTD1 at 2.)  Plaintiffs, however, allege that InterHealth's own website displays a video promoting the Labrada DUAL ACTION FAT BUSTER, which is sufficient to show that InterHealth played a direct role in the marketing and advertising of the allegedly deceptive product.  (Opp. 1 at 7.)  As mentioned before, the licensing agreement is sufficient to allege the degree of control sufficient to infer Supplier Defendants' liability at the pleading stage.  See <u>JTH Tax, Inc.</u>, 212 Cal. App. 4th.

As discussed, the UCL imposes liability on parties whose agents engage in false advertising or unfair business practices, or who participate in a scheme that results in the dissemination of misleading or deceptive advertising (even if their role in the tortious acts may not give rise to liability independently).  The Supplier Defendants' liability for Dr. Oz's misrepresentations in promoting their products is also adequately alleged.  Plaintiffs' allegations are sufficient to raise a plausible inference that the Supplier Defendants aided and abetted the Labrada Defendants, furnished the means for the UCL and FAL violations, induced the Labrada Defendants' UCL and FAL violations, and/or conspired to engage in unfair or deceptive business practices.

---

[2] The Court in <u>Kwikset</u> specifically rejected the argument that dismissal was warranted because plaintiffs failed to specifically allege actual reliance on defendants' "MADE IN THE USA" designation.  51 Cal. 4th 310.  The Court explained that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  <u>Id.</u> at 327.

[3] The Ninth Circuit in <u>Williams</u> reversed the district court's dismissal of a consumer action for false advertising.  552 F.3d 934.  In <u>Williams</u>, the district court dismissed the UCL and FAL claims because it concluded that plaintiffs could not have been misled by the "all natural" label since the ingredients list was also displayed on the packaging.  The Ninth Circuit rejected that argument and reversed.  <u>See id.</u>at 939 ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception.").

Accordingly, InterHealth and Naturex's Motions to Dismiss Plaintiffs' UCL, FAL, and CLRA claims—which raise substantially the same arguments—are DENIED.

Because all of the Defendants interpret Aloudi as binding authority with respect to Plaintiffs' claims, the Court discusses Aloudi to avoid confusion going forward. Defendants' reliance on Aloudi overlooks an essential distinction between the allegations in Aloudi and the Plaintiffs' allegations here. The plaintiffs in Aloudi supported their claims that defendants made material omissions and misrepresentations by pointing to: (a) the lack of clinical trials showing that the dietary supplements were effective; and (b) the absence of any information on the defendants' website substantiating the effectiveness of the Green Coffee Extract. Aloudi v. Intramedic Research Grp., LLC, No. 15-CV-00882-HSG, 2015 WL 4148381, at *1 (N.D. Cal. July 9, 2015).

The allegations in Aloudi relied on FDA and Senate reports finding inadequate data to establish the effectiveness of pills containing caffeine and green coffee extract for weight loss. Id. The Aloudi plaintiffs' CLRA, FAL, UCL, MMWA, and warranty claims asserted only that the effectiveness of the defendants' products were unproven; i.e., there was insufficient—not false—evidence of the products' effectiveness. Here, on the other hand, Plaintiffs have alleged affirmative falsities on the Labrada Products' labels, and the question of whether or not these allegedly false statements are deceptive does not require scientific testing. To be sure, unlike the defendants in Aloudi, whose infringing conduct was simply failing to cite any studies to support their effectiveness, the Defendants here cited specific studies on the Products' packaging.

Plaintiffs' allegations here are more analogous to claims asserted in In re Clorox Litigation, which survived a motion to dismiss despite the defendants' insistence that they were mere lack of substantiation claims. In re Clorox Consumer Litig., 894 F. Supp. 2d 1224 (N.D. Cal. 2012). Like the plaintiffs in In re Clorox Litigation, Plaintiffs' allegations here specify affirmative and deceptive statements Defendants made related to the scientific support for the effectiveness of the Labrada Products. More importantly, it bears repeating that Plaintiffs allege that Supplier Defendants "assert[] direct unbridled control over the content of the Labrada Product label," which the Court must take as true at the motion to dismiss stage. (Opp. 2 at 1.) As such, any falsehoods on the Labrada product labels can be plausibly attributed to the Supplier Defendants. (Id. at 3); see People v. Witzerman (imposing liability on all defendants—including those who did not have knowledge that the acts of others with whom they did business were unlawful—because "[a]ll of the defendants 'cooperated with each other' in the advertising and sale of the particular offending service.").

Since the sample licensing plausibly allege that Supplier Defendants "ordered or induced the conduct," the provision of the active ingredients plausibly constitutes "substantial assistance," and Plaintiffs sufficiently allege Supplier Defendants' knowledge of the purported misrepresentations, Plaintiffs have stated a claim under any of their theories of liability. Supplier Defendants' motions to dismiss Plaintiffs' UCL, FAL, and CLRA claims are therefore DENIED.

**C. Claims Under New York Law**

InterHealth and Naturex argue that New York's consumer protection statutes, sections 349 and 350, are inapplicable because Plaintiffs fail to show that the Supplier Defendants engaged in any consumer-oriented activities.  (MTD1 at 3; MTD2 at 5.)  With respect to Plaintiff Morrison's section 349 and 350 claims, InterHealth argues that it is not covered by sections 349 and 350 because it "does not sell these ingredients to consumers."  (Id.)  As to Plaintiff Rizzo-Marino, InterHealth states that she "cannot bring claims against InterHealth as she alleges she purchased only the Labrada Green Coffee Bean Extract FAT LOSS OPTIMIZER[], of which InterHealth has no involvement."  (R1 at 19.)

### 1. Legal Standard

New York General Business Law ("GBL") section 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349.  "To establish a prima facie case under GBL Section 349, 'a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'"  In re Scotts EZ Seed Litig., 304 F.R.D. 397, 409 (S.D.N.Y. 2015) (citing Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000).  Like false advertising claims under California law, "[m]ateriality under Section 349 of the GBL is an objective inquiry" that considers whether a deceptive is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  Id. at 409.

New York General Business Law section 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."  N.Y. Gen. Bus. Law § 350.  The "consumer oriented" prong under Sections 349 and 350 requires plaintiff to show that practices complained of have broad impact on consumers at large.  DePasquale v. Allstate Ins. Co., 179 F. Supp. 2d 51 (E.D.N.Y.), aff'd, 50 F. App'x 475 (2d Cir. 2002).  This requirement has been construed liberally.  New York v. Feldman, 210 F. Supp. 2d 294 (S.D.N.Y. 2002).

### 2. Analysis

Plaintiffs allege sufficient facts to state a claim against the Labrada Defendants, InterHealth, and Naturex for violations of New York's prohibition on unfair or deceptive practices under section 349 and New York's prohibition on false advertising under section 350.

Without rehashing the sufficiency of Plaintiffs' allegations as to Supplier Defendants' right to control the content of the Products' labels, the FAC provides adequate factual allegations to infer that all three defendants engaged in deceptive acts directed at consumers.  With respect to InterHealth's standing argument, section 349 allows for Plaintiffs like Rizzo-Marino to establish standing by alleging either a "consumer injury or harm to the public interest."  Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211, 218 (2d Cir. 2004).

Besides, even if Naturex and InterHealth's involvement went no further than providing ingredients to Labrada, this would still be considered "consumer-oriented" activity under sections 349 and 350. It is plausible to infer that InterHealth and Naturex supplied Labrada with SuperCitrimax and Svetol so these products could ultimately be sold to consumers. Even more so due to the exceptionally broad interpretation New York courts have given to "consumer oriented activity." Karlin v. IVF Am., Inc., 93 N.Y. 2d 282, 290–91 (N.Y. 1999) ("These statutes on their face apply to virtually all economic activity, and their application has been correspondingly broad.") (internal citations omitted).

Since the ultimate resolution of the whether New York's prohibitions on unfair business practices and false advertising apply to InterHealth and Naturex's conduct depends on facts outside the pleadings, and liability for violating New York's consumer protection laws is plausible based on the allegations contained in the FAC, both Supplier Defendants' motions to dismiss Counts 11 and 12 of the FAC are DENIED.

## D. Warranty Claims

Finally, the Labrada Defendants maintain that all the Plaintiffs' warranty claims are inadequately pled and fail because (a) Plaintiffs fail to identify what warranty was breached (see, e.g., MTD3 at 12) or (b) the statements are simply "puffery" because Plaintiffs failed to allege the exact terms of the warranties. (Id. at 13.) Because Supplier Defendants do not sell products, they assert they cannot be held liable for breach of express warranty. (MTD1 & 2.) Relatedly, the Supplier Defendants argue that Plaintiffs cannot sustain their breach of warranty claims by alleging that they were third-party beneficiaries to the licensing agreements because even if entered into, "the purported contract[s] [were] not expressly made for plaintiffs' benefit." (Id. at 15-16, 4-5.) Naturex further argues that Plaintiffs cannot rely on an agency theory of liability because "Plaintiffs do not allege that Labrada was Naturex's agent or had any authority to act on behalf of Naturex." (R2 at 9-10.)

"A warranty relates to the title, character, quality, identity, or condition of the goods." Keith v. Buchanan, 173 Cal.App.3d 13, 20 (1985) (internal citation omitted). For Plaintiffs to state a claim for breach of warranty, they must allege that: (a) the defendant made a warranty; (b) the product did not comply with the warranty at the time of sale; (c) plaintiff's injury was proximately caused by the defective nature of the product; and (d) the plaintiff suffered damage. Hauter v. Zogarts, 14 Cal. 3d 104, 105 (1975).

In deciding whether a statement or affirmation made by a seller constitutes an express warranty under section 2313 of the California Commercial Code or section 2-313 of the New York Uniform Commercial Code, the Court must decide whether the seller's statement constitutes an affirmation of fact or a promise or description of the goods or whether it is instead, "merely the seller's opinion or commendation of the goods." Buchanan, 173 Cal. App. 3d at 13; Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628 (S.D.N.Y. 1999). Assuming the language creates a warranty, the Court must then determine whether the statement was "part of the basis of the bargain." Id. Finally, the Court determines whether the warranty was breached. Id.

Liability under an implied warranty "does not depend on any specific conduct or promise of defendant, but turns on whether the product is merchantable under the California Uniform Commercial Code." Hauter v. Zogarts, 14 Cal. 3d at 105. "A plaintiff who claims a breach of the implied warranty of merchantability must show that the product did not possess even the most basic degree of fitness for ordinary use." Viggiano v. Hansen Nat. Corp., 944 F. Supp. 2d 877 (C.D. Cal. 2013). Still, whether or not a warranty of fitness for a particular purpose arises in any individual case is fundamentally a question of fact to be determined by the circumstances of contracting. See e.g., Pronti v. DML of Elmira, Inc., 103 A.D.2d 916 (N.Y. App. Div. 1984) ("Whether there was a breach of implied warranty of merchantability is factual question for jury determination.") (citing McKinney's Uniform Commercial Code § 2–314(2)(c).).

To state a claim under the Magnuson Moss Warranty Act ("MMWA"), Plaintiffs must adequately plead a cause of action for breach of a written or implied warranty under state law. Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 (9th Cir. 2008). The MMWA defines a "written warranty" as a:

> written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material . . . and affirms or promises that such material ... is defect free or will meet a specified level of performance over a specified period of time.

15 U.S.C. § 2301(6)(A); Bruton v. Gerber Prod. Co., 961 F. Supp. 2d 1062, 1098 (N.D. Cal. 2013). The MMWA defines "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ." Forcellati v. Hyland's, Inc., 876 F. Supp. 2d 1155, 1164 (C.D. Cal. 2012) (citing 15 U.S.C. § 2301(1)).

## 1. Analysis

Plaintiffs have adequately pleaded the elements of a claim for breach of express warranty against the Labrada Defendants. First, the statements on the Labrada Products promising to aid in "[s]ignificant weight loss" describe the effectiveness of the product, and the statements regarding the quality and concentration of active ingredients are product descriptions that lend credibility to the manufacturer's promise that the products will perform as advertised. Allen v. Hyland's Inc., No. CV 12-01150 DMG MANX, 2013 WL 1748408, at *6 (C.D. Cal. Apr. 11, 2013). The statements on the Products' labels plausibly constitute descriptions of their nature— i.e., written affirmations by which an express warranty is created.

Plaintiffs assert these products are ineffective, which is contrary to the representations on the labels. Defendants' representation that the effectiveness of the products are supported by peer-reviewed and published studies, while not creating an independently actionable express warranty, provide additional support for Plaintiffs' claims that the products are ineffective. Dorsey v. Rockhard Labs., LLC, No. CV 13-07557 DDP RZX, 2014 WL 4678969, at *9 (C.D. Cal. Sept. 19, 2014); Allen, 2013 WL 1748408 at *5 ("While a product that is 'synthetic' and 'artificial' may not be defective, a product that is ineffective is."). Plaintiffs sufficiently allege that the Labrada

Products do not and cannot provide the promised effects.  Sandoval v. PharmaCare US, Inc., 145 F. Supp. 3d 986, 997 (S.D. Cal. 2015).  Therefore, taking the allegations as true, Plaintiffs state a claim for breach of express warranty against the Labrada Defendants.

Of course, reliance is not required to state a claim for an express warranty: Plaintiffs only need to show that the statement formed the basis of the bargain.  Shell v. Schmidt, 126 Cal. App. 2d 279 (1954).  But in the absence of an express warranty or when the parties lack privity, Plaintiffs' reliance on a representation by a manufacturer can form the basis of an actionable implied warranty.  Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1023 (9th Cir. 2008) (describing several exceptions to the privity requirement for breach of warranty claims as follows: "The first arises when the plaintiff relies on written labels or advertisements of a manufacturer."); Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075 (N.D. Cal. 2011) (describing some exceptions to the privity requirement as "cases when the plaintiff relies on written labels or advertisements of a manufacturer," "special cases involving foodstuffs, pesticides, pharmaceuticals," and "where the end user is an employee of the purchaser.").

With that in mind, Plaintiffs allege they relied on the statements on the packaging promising "[s]ignificant weight loss" and would not have purchased the Products had they known that the Products could not perform as promised.  Plaintiffs' reliance is sufficient to state a claim for breach of implied warranty of merchantability (or fitness) because it is plausible to infer that the promised weight loss benefits were the basis of the bargain.

Citing In re ConAgra Foods, 90 F. Supp. 3d, 984 (C.D. Cal. 2015), the Labrada Defendants attack the sufficiency of the allegations underlying the warranty claims because Plaintiffs did not show that the "Made in the USA" statement was part of the basis of the bargain.  But the standard is not a subjective one.  In re ConAgra Foods, Inc., 90 F. Supp. 3d 919 (C.D. Cal. 2015) ("Proof of reliance on specific promises or representations is not required for a breach of express warranty claim under California law.").  Since plaintiffs need not show proof of reliance on specific promises, only that the alleged misrepresentation would have been material to a reasonable consumer, Plaintiffs need not specifically plead they relied on each and every one of Defendants' allegedly misleading statements to state their warranty claims.

With respect to the Labrada Defendants' contentions that the statements on the product labels constitute "mere puffery," they are mistaken.  "Puffing" has been described by most courts as "involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers."  Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246 (9th Cir. 1990).  Here, Plaintiffs claim that the Products cannot perform as promised because their only active ingredients have no measurable effect on weight loss.  Plaintiffs' allegations are neither vague nor subjective because Plaintiffs' contention that the Products cannot perform as promised is a "specific factual assertion that [can] be established or disproved through discovery."  Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133 (C.D. Cal. 2005).

What's more, alleging the Labrada Products are not fit for any suitable purpose supports a claim for breach of implied warranty whether a contract can be found to emanate from the

statements on the product labels.  An implied warranty of merchantability exists by operation of law so it arises from and accompanies every retail sale of consumer goods.  Viggiano v. Hansen Nat. Corp., 944 F. Supp. 2d 877 (C.D. Cal. 2013).  Since the FAC asserts that the ordinary and intended purpose of the Labrada Products was to aid in weight loss, Plaintiffs' allegations that these weight-loss supplements cannot serve their intended purpose satisfies the pleading requirements to state a claim for breach of the implied warranty of merchantability.  At any rate, since the issue of breach is a factual issue, it cannot be resolved at this stage.  In conclusion, the Labrada Defendants' Motion to Dismiss Plaintiffs' Breach of Express and Implied Warranty Claims are DENIED.  Next, the Court turns to the sufficiency of warranty allegations against the Supplier Defendants.

In the absence of privity or an express agreement between the parties, Plaintiffs must allege that they: (a) relied on written labels or advertisements of a manufacturer; (b) the product falls within the special cases involving foodstuffs, pesticides or pharmaceuticals; (c) they were the intended third-party beneficiaries of the contracts between Labrada and each supplier defendant; or (d) the relations between the Plaintiffs and the Supplier Defendants justify treating the parties as if they were in contractual privity under the Direct Dealings Exception.  Cardinal Health 301, Inc. v. Tyco Electronics Corp., 169 Cal. App. 4th 116 (Cal. Ct. App. 2008).

 Whether these exceptions apply turns on facts outside the pleadings—i.e., the relations between Labrada and each Supplier Defendant, the terms of the contracts and the intent of the parties in entering those contracts, as well as the specific circumstances under which the contracts were entered.  Landale-Cameron Court, Inc. v. Ahonen, 155 Cal. App. 4th 1401 (2007).  Since the contracts alleged to intentionally benefit third-party Plaintiffs are not yet before the Court, there can be no meaningful resolution of whether these exceptions to the privity requirement apply.  Accordingly, the Court DENIES Interhealth and Naturex's motions to dismiss Plaintiffs' breach of warranty claims under state law.

The Supplier Defendants further argue that they cannot be liable under the MMWA because it expressly states that "drugs, devices, or cosmetics" as defined in the FDCA are not "consumer product[s]."  15 U.S.C. § 2311.  Even still, for dietary supplements to be excluded from the definition of "consumer product," they first must satisfy the requirements of section 343, which mandate proper labeling regarding quality and quantity.  21 U.S.C.A. § 343.  For instance, to be labeled a "drug" and excluded from the definition of "consumer products," ". . . the manufacturer of the dietary supplement [must have] substantiation that such statement is truthful and not misleading . . . ."  Id.  The answer to this question cannot be settled by the pleadings.  Accordingly, this argument is better suited for a motion for summary judgment and Supplier Defendants' motions to dismiss Plaintiffs' MMWA claim is hereby DENIED.

### E. Naturex's Motion to Strike

Pursuant to Rule 12(f), a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Whittlestone, Inc. v. Handi–Craft Co., 618 F.3d 970, 973 (9th Cir.2010).  To the extent the Naturex's Motion to

Strike is grounded in evidentiary frailties, these challenges can be brought at the summary judgment stage or at trial. The Court will not consider the veracity Plaintiffs' sources at the pleading stage since Plaintiffs do not need to prove that the Labrada Products are in fact ineffective to state their claims. Since none of the Plaintiffs allegations arise to "immaterial, impertinent, or scandalous matter," Naturex's Motion to Strike is DENIED.

## III. PRUDENTIAL ISSUES

Naturex also raises standing and prudential bases in support of its motion to dismiss. (MTD2 at 6.) Specifically, Naturex argues that Plaintiffs lack Article III standing to pursue injunctive relief, and the Court should abstain from involving itself in this matter under the doctrine of primary jurisdiction. (Id.) As mentioned before, Plaintiffs have established standing to pursue these claims: they have alleged an injury in fact caused by Defendants' conduct that can be redressed by a favorable decision from this Court. Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992); Kwikset, 51 Cal. 4th at 342.

Primary jurisdiction is a prudential doctrine that permits courts to determine "that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 760 (9th Cir. 2015). Courts consider the following non-exhaustive factors in deciding whether the doctrine of primary jurisdiction applies: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." Id. The doctrine "is to be used only if a claim 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." Ivie v. Kraft Foods Glob., Inc., No. C-12-02554-RMW, 2013 WL 685372, at *5 (N.D. Cal. Feb. 25, 2013).

Naturex has yet to put forth any information regarding the actions the FTC has taken with respect to the Vinson Study or why any developments in the FTC's investigation might bear on the resolution of Plaintiffs' state consumer law claims. Moreover, none of the factors warranting abstention appear particularly salient here. The invocation of primary jurisdiction is discretionary, and at this time, the Court is not convinced it would be appropriate. As such, Naturex's Motion to Dismiss Plaintiffs' claims on these grounds is DENIED.

## V. CONCLUSION

For the aforementioned reasons, the Court DENIES Defendants' motions in their entirety.

   **IT IS SO ORDERED.**